CONSOLIDATED EXPRESS,
INC., Plaintiff,

v.

NEW YORK SHIPPING ASSOCIATION,
INC., et al., Defendants.

TWIN EXPRESS, INC., Plaintiff,

v.

NEW YORK SHIPPING ASSOCIATION,
INC., et al., Defendants.

Civ. A. Nos. 76–1645, 77–156.

United States District Court,
D. New Jersey.

Dec. 19, 1977.

As Amended May 11, 1978.

Crummy, DelDeo, Dolan & Purcell by John A. Ridley, Newark, N. J., Steptoe & Johnson by Richard Whiting, Washington, D. C., for plaintiffs Consolidated Exp., Inc. and Twin Exp., Inc.

Carpenter, Bennett & Morrissey by Michael S. Waters, Newark, N. J., Lorenz, Finn, Giardino & Lambos by C. P. Lambos, New York City, for defendants New York Shipping Ass'n, Inc., Intern. Terminal Operating Co., John McGrath Corp., Pittston Stevedoring Corp., and Universal Maritime Services Corp.

Irwin Herschlag, Montclair, N. J., Thomas W. Gleason, New York City, for defendant Intern. Longshoremen's Ass'n, AFL–CIO.

Thomas F. Durkin, Jr., Newark, N. J., for defendants United Terminals Corp. and Seatrain Lines, Inc.

Meyner, Landis & Verdon by Jeffrey L. Reiner, Newark, N. J., Davis, Polk & Wardwell, New York City, for defendant Sea-Land Service, Inc.

## OPINION

STERN, District Judge.

### I. INTRODUCTION

In this lawsuit, plaintiff Consolidated Express (hereinafter Conex) seeks to recover money damages for injuries it claims to have suffered by reason of the implementation of the infamous 1969 Rules on Containers, a collectively-bargained response to the perceived threat to waterfront labor posed

by technological change in the shipping industry.[1]

Since World War II, the introduction of increasingly large containers has enabled the shipping industry gradually to replace piece-by-piece loading and unloading work performed by the longshoremen on the piers with block handling of cargo. By use of mammoth containers, shipments of diverse firms can be consolidated into one container which can be "stuffed" far from the waterfront. The containers are then sent to the piers where they are loaded onto waiting ships. This innovation has increased productivity, but has produced decline in demand for the services of the members of the defendant International Longshoremen's Association (ILA).

In 1958, the ILA protested the use of containers and commenced a strike against defendant New York Shipping Association (NYSA). In the contract adopted in 1959, the union conceded that "any employer shall have the right to use any and all types of containers without restriction."[2]

In the following decade, fully containerized ships were introduced and the use of containers increased dramatically. The loss of work opportunities occasioned by these developments led the ILA to negotiate the "Rules on Containers" in 1969. By these agreements, the NYSA guaranteed that all cargo lots which had been of less than a container size but which had been consolidated with other lots into one container would be stripped when the container arrived on the docks by longshoremen on the dock, if the cargo had originated from or was to be shipped to a point within 50 miles of the dock. The Rules provided for a penalty against the carrier in the amount of $250 per container for any container which went through dockside without being stripped and stuffed in accordance with the Rules.[3] In 1970, the penalty was increased

---

1. A complaint has also been filed by Twin Express, Inc., against the same defendants (except Twin does not sue Seatrain) arising out of the same facts. The suits have been consolidated for trial on the issue of liability. Twin has joined in Conex's motion for summary judgment, and both plaintiffs and all defendants have agreed to to bound by the Court's determination of this motion. Twin, like Conex, is a consolidator and corporation of Puerto Rico. Although the discussion in text will refer to Conex, it applies equally to the Twin suit, unless otherwise noted.

2. Section 8 of the 1959 memorandum of settlement was entitled "Containers-Dravo Size or Larger" and provided:

 a. Any employer shall have the right to use any and all type of containers without restriction or stripping by the union.

 b. The parties shall negotiate for two weeks after the ratification of this agreement, and if no agreement is reached shall submit to arbitration . . . the question of what should be paid on containers which are loaded or unloaded away from the pier by non-ILA labor, such submission to be within 30 days thereafter.

 c. Any work performed in connection with the loading and discharging of containers for employer members of NYSA which is performed in the Port of Greater New York whether on piers or terminals controlled by them, or whether through direct contracting out, shall be performed by ILA labor at longshore rates.

Notwithstanding this concession, union objections to container use continued and there is much support in the record for the view that containers did not move freely through the ports. See Affidavit of James M. Dickman, Apr. 12, 1977; Affidavit of Thomas W. Gleason, May 1, 1977.

3. "Rules on Containers":

 "Rule 1. Definitions and rule as to containers covered.

 "Stuffing—Means the act of placing cargo into a container.

 "Stripping—Means the act of removing cargo from a container.

 "Loading—Means the act of placing containers aboard a vessel.

 "Discharging—Means the act of removing containers from a vessel.

 "These provisions relate solely to containers meeting each and all of the following criteria:

 "(a) Containers owned or leased by employer-members (including containers on wheels) which contain LTL loads or consolidated full container loads.

 "(b) Such containers which come from or go to any person (including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder, who is either a consolidator of outbound cargo or a distributor of inbound cargo) who is not the beneficial owner of the cargo.

 "(c) Such containers which come from or go to any point within a geographical area of

to $1,000 per violation. Disputes continued and, in 1973, CONASA (an organization of shipping associations, including NYSA, with authority to negotiate) and the ILA met and entered into the "Dublin Supplement" which provides, in part, as follows:

Enforcement of Rules on Containers.

\* \* \* \* \* \*

1. (a) All outbound (export) consolidated or LTL container loads (Rule 1 containers) shall be stripped from the container at pier by deepsea ILA labor and cargo shall be stuffed into a different container for loading aboard ship.

1. (b) All inbound (import) consolidated or LTL cargo (Rule 1 containers) for distribution shall be stripped from the container and the cargo placed on the pier where it will be delivered and picked up by each consignee.

2. No carrier or direct employer shall supply its containers to any facilities operated in violation of the Rules on Containers including but not limited to a consolidator who stuffs containers of outbound cargo or a distributor who strips containers of inbound cargo and including a forwarder who is either a consolidator or a distributor. No carrier or direct employer shall operate a facility in violation of the Rules on Containers which specifically require that all containers be stuffed or stripped at a waterfront facili-

ty (pier or dock) where vessels normally dock.

A list shall be maintained of consolidation and distribution stations which are operated in violation of the Rules for the information of all carriers and direct employers. Any container consolidated at or distributed from such facilities shall be deemed a violation and subject to the rules on stuffing and stripping.

Consolidated Express, a Puerto Rican corporation, is a nonvessel owning common carrier engaged in the business of containerizing less than container load (LCL) or less than trailer load (LTL) cargo for shipment between Puerto Rico and its inland facilities located within 50 miles of the Port of New York. In the trade, plaintiff is known as a "consolidator," that is, it is in the business of handling LCL or LTL goods for customers wishing to ship such goods. Consolidators "unitize" or consolidate the crates of several customers into large containers provided by the shipping companies. The consolidators pack their customers' crates into containers, and then truck them to pierside facilities where they are loaded onto ships.

Defendant New York Shipping Association is an association of employers engaged in various operations related to the shipment of freight into and out of the Port of

any point in the North Atlantic District described by a 50-mile circle with its radius extending out from the center of each port.

"Rule 2. Rule of stripping and stuffing applies to such containers.

"A container which comes within each and all of the criteria set forth in Rule 1 above shall be stuffed and stripped by ILA longshore labor. Such ILA labor shall be paid and employed at longshore rates under the terms and conditions of the General Cargo Agreement. Such stuffing and stripping shall be performed on a waterfront facility, pier or dock. No container shall be stuffed or stripped by ILA longshore labor more than once. Notwithstanding the above provisions, LTL loads or Consolidated Container loads of mail, of household goods with no other type of cargo in the container, and of personnel effects of military personnel shall be exempt from the rule of stripping and stuffing.

"Rule 3. Rules on No Avoidance or Evasion.

\* \* \* \* \* \*

"(c) Failure to stuff or strip a container as required under these rules will be considered a violation of the contract between the parties. Use of improper, fictitious or incorrect documentation to evade the provisions of Rule 2 shall also be considered a violation of the contract. If for any reason a container is no longer at the waterfront facility at which it should have been stuffed or stripped under the rules, then the steamship carrier shall pay, to the joint Container Royalty Fund liquidated damages of $250 per container which should have been stuffed or stripped. Such damages shall be used for the same purposes as the first Container Royalty is used in each port. If any carrier does not pay liquidated damages within 30 days after exhausting its right to appeal the imposition of liquidated damages to the Committee provided in (g) below, the ILA shall have the right to stop working such carrier containers until such damages are paid."

New York. On behalf of its member-employees, NYSA conducts collective bargaining negotiations and enters into collective bargaining agreements with labor organizations, including defendant ILA which represents the employees of NYSA's member employers. Defendants Sea-Land and Seatrain are common carriers by water. As part of their business, they furnish containers and trailers, terminal facilities, and cargo space on vessels which they own or lease. They are also in the business of providing stevedoring services for cargo shipped aboard their vessels. Such services include loading and unloading cargo on and off their vessels and receiving delivery of cargo at dockside. Defendants International Terminal Operating Co., Inc., John M. McGrath Corp., Pittston Stevedoring Corp., United Terminal. Corp., and Universal Maritime Services Corp. are members of the NYSA. Each is engaged, in part, in the business of providing stevedoring services as described above.

On June 1, 1973, Conex filed charges with the National Labor Relations Board alleging that the ILA had violated § 8(b)(4)(ii)(B) of the National Labor Relations Act, which forbids union activity which forces any employer "to cease doing business"[4] with any other employer, and that the ILA and NYSA had violated § 8(e)[5] which prohibits agreements requiring such a cessation. Complaints issued and the General Counsel, pursuant to § 10(*l*)

sought preliminary injunctive relief against the union and the shipping association.

The complaint came before Judge Lacey who granted the petition·for a preliminary injunction. *Balicer v. ILA,* 364 F.Supp. 205 (D.N.J.1973). Testimony of nine witnesses before Judge Lacey consumed seven days and 1,200 pages of transcript.[6] Noting the limited role of the Court in a 10(*l*) proceeding, Judge Lacey held that the NLRB's legal theory—that the challenged activities were impermissible work reacquisition— was substantial, and that the issuance of a temporary injunction was "just and proper." The Court of Appeals for the Third Circuit affirmed. *Balicer v. ILA* 491 F.2d 748 (3rd Cir. 1973) (mem.)

The case was then submitted to an Administrative Law Judge on the basis of a stipulated record consisting of the record of the injunction proceeding before Judge Lacey, including extensive documentary evidence, and supplementary affidavits. The Administrative Law Judge determined that the ILA boycott of Conex and the contractual agreement between the union and the shipping association were addressed to the labor-management relations of the NYSA employer-members vis-a-vis their own employees. He held that the activities were therefore protected "primary conduct."

The NLRB reversed. *Consolidated Express, Inc.,* 221 NLRB No. 144 (1975). The Board found the agreement to be improper under § 8(e) because its objective was to

---

4. Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(ii)(B), provides in pertinent part:
 (b) It shall be an unfair labor practice for a labor organization or its agents—
 * * * * * *
 (4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is—
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . .

5. Section 8(e), 29 U.S.C. § 158(e) (1970) reads, in pertinent part:

It shall be an unfair labor practice for any labor organization to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person.

6. Called as witnesses for NYSA were its president, James J. Dickman; the vice-president in charge of operations of ITT (an NYSA member with whom Conex has settled its claims); Sea-Land's manager of cargo operations; NYSA's administrative director; and Sea-Land's chairman of the board and chief executive officer. The ILA called Thomas Gleason, its international president since 1963, and in the industry since 1915.

force the NYSA to cease doing business with the consolidators. The NLRB rejected the argument that the contract constituted a valid effort by the ILA to preserve for its members a type of work which they had historically performed. It reasoned that the "work in controversy" was that work performed by the consolidators at their off-pier facilities, not the traditional cargo handling done at dockside by longshoremen. The agreement thus could not be viewed as work preservation lawful under the Supreme Court decision in *National Woodwork Manufacturers Ass'n v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Moreover, reasoned the Board, even assuming that the ILA once had a valid claim to the strip and stuff work, that claim had been abandoned in the 1959 ILA–NYSA agreement. Finally, the Board con-

sidered the "economic personality of the industry" and noted that the absence of a clear distinction between strip and stuff work and the work related to preparing containers for shipment could lead to a future ILA claim to all such work with "enormous impact on the shipping industry". The Board further ruled that the union's actions in enforcing the agreement were unfair labor practices under § 8(b)(4)(ii)(B).

The Court of Appeals for the Second Circuit found that the Board's order was supported by substantial evidence and sustained it. *ILA v. NLRB,* 537 F.2d 706 (2nd Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). Judge Wyzanski, writing for the Court, premised enforcement of the order on the Board's finding that there was no valid work preservation agreement.[7] It is against this

---

7. The critical portion of the Second Circuit opinion reads as follows:

The following parts of [the NLRB] opinion seem to us controlling and convincing.

. . . the disposition of this case turns on whether ILA's activities and its contractual agreements with NYSA had primary or secondary objectives. If ILA's activities and its agreements with NYSA were designed to preserve work to which ILA-represented employees working in the Port of New York were entitled, then both the activities and the contractual arrangements would be primary in purpose and, therefore, would not be unlawful. However, if ILA's real object was to obtain either work traditionally performed by employees not represented by ILA or work to which ILA had abandoned all claims, then the pressures on NYSA members and the contractual arrangements would have a secondary object and would violate Section 8(b)(4)(ii)(B) and 8(e), respectively. As the United States Supreme Court instructed in *National Woodwork Manufacturers Association v. N. L. R. B.,* "[t]he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees."

\* \* \* \* \* \*

. . . in order to properly evaluate the validity of ILA's claim to the work, "it is essential to define with some precision the work in controversy since that is the predicate upon which the issue of work preservation must turn." It is clear from the record that the work in controversy here is the LCL and LTL container work performed by Consolidated and Twin at their own off-pier premises. It is with this precise work in

mind that the contentions of the parties must be evaluated.

The traditional work of the longshoremen represented by ILA has been to load and unload ships. When necessary to perform their loading and unloading work, longshoremen have been required to stuff and strip containers on the piers.

Similarly, for many years, maritime cargo has been sorted and consolidated off the docks by companies employing teamsters and unrepresented employees. With the advent of vessels designed exclusively to carry the large containers presently in use, these consolidating companies, such as Consolidated and Twin, have continued to consolidate shipments into containers prior to their placement aboard the vessels. The consolidators generate such work themselves, performing it not on behalf of the employer-members of NYSA but for their own customers who have goods to ship. Furthermore, they perform this consolidation work at their own off-pier premises, with their own employees who are outside the unit represented by ILA, and who fall within the coverage of separate collective-bargaining agreements, under which they are represented by other labor organizations. It is clear, therefore, that Consolidated and Twin have traditionally been engaged in the work of stuffing and stripping containers such as are here in controversy.

From the foregoing and the record as a whole, it is clear that the on-pier stripping and stuffing work performed by longshoremen as an incident of loading and unloading ships does not embrace the work traditionally performed by Consolidated and Twin at

backdrop that plaintiff's motion for summary judgment must be evaluated.

Plaintiff has moved for partial summary judgment on the issue of defendants' liability under Counts I and III of the complaint. Count I charges all defendants with a group boycott or concerted refusal to deal, alleged to be *per se* violations of §§ 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Count III seeks damages against defendant ILA under § 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b) for its violation of § 303(a) of that Act, 29 U.S.C. § 187(a).

In brief, plaintiff argues that the 1975 determination by the National Labor Relations Board that the Rules on Containers and the enforcement thereof constituted unfair labor practices be given collateral estoppel effect and that the Board's determination is dispositive of all issues raised in this lawsuit. All defendants oppose the application of collateral estoppel in the context of this lawsuit and assert a number of affirmative defenses. Plaintiff insists that each and every defense is insufficient as a matter of law.

## II. COUNT III—UNFAIR LABOR PRACTICE CLAIM

Under Count III, plaintiff seeks damages from the ILA under § 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b) for its violations of § 303(a) of that Act, 29 U.S.C. § 187(a). Section 303 provides:

(a) It shall be unlawful, for the purpose of this section only, . . . for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title [§ 8(b)(4) of the NLRA].

(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) . . . may sue therefor in any district court of the United States . . . and shall recover the damages by him sustained and the cost of the suit.

Section 8(b)(4)(B), 29 U.S.C. § 158(b)(4)(ii)(B), provides, in pertinent part:

(b) It shall be an unfair labor practice for a labor organization or its agents—

. . . . .

(4) . . . (ii) to threaten, coerce, or restrain any person engaged in commerce . . . where . . . an object thereof is—

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other person, . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . .

Conex maintains that the union's commission of an unfair labor practice within the meaning of § 8(b)(4) was established in the NLRB proceedings and that the ILA is collaterally estopped from relitigating the facts underlying the Board's determination or the legal conclusions which it reached. The ILA argues that collateral estoppel does not apply under the circumstances present in this case. It also argues that

their own off-pier premises. It does not fall within ILA's traditional role to engage in make-work measures by insisting upon stripping and stuffing cargo merely because that cargo was originally containerized by nonunit personnel. Yet, ILA's demands here could only be met if the work traditionally performed off the pier by employees outside the longshoremen unit were taken over and performed at the pier by longshoremen represented by ILA.
Judge Feinberg dissented, arguing that the Board had erred in identifying the work in controversy. He maintained that the work which could be preserved without violating 8(e) must be defined as the generic category of preparation of cargo for shipment, not as the specific tasks currently being performed by the longshoremen. In his view, under the Board's and the majority theory, work preservation agreements would be virtually precluded where it could be established that other employees at other sites were doing or had done the work for which protection was sought.

plaintiff's own illegal activities preclude recovery. It contends that Conex's claims are barred by the statute of limitations. And it raises a number of equitable defenses.

## A. COLLATERAL ESTOPPEL.

■ The parties agree that *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966) establishes the criteria for application of the doctrine of collateral estoppel to an administrative determination. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *Id.*, at 422, 86 S.Ct., at 1560.

Section 303(a) of the Labor Management Relations Act requires a determination of whether the ILA committed an unfair labor practice within the meaning of § 8(b)(4) of the NLRA. *International Longshoremen's Union v. Juneau Spruce Corp.*, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275 (1952). The NLRB ruled that the ILA had committed such a forbidden practice. ILA argues, however, that that conclusion should not be binding here. I disagree.

■ The major thrust of the union's argument is that it did not receive a full and fair hearing before the Board because it was afforded no discovery rights in the Board's proceedings. Acceptance of this theory would, in effect, mean that collateral estoppel could never be applied to an administrative determination; discovery under the federal rules is never available on the administrative level. Moreover, in the context of this litigation, the ILA's claim is

particularly unpersuasive. At the lengthy hearing before Judge Lacey, the ILA was represented by counsel and had a full opportunity to call, examine, and cross-examine witnesses and to introduce documentary evidence. As augmented by affidavits, and by agreement of the parties, this was the record upon which the Board made its determination. Appeal of the Board's decision was prosecuted vigorously. Under these circumstances, I must conclude that the ILA had a full and fair opportunity to litigate its claims.

Its contention that "newly discovered evidence" compels a different resolution of the substantive issue is unpersuasive. Even if a different conclusion could be reached if the ILA were permitted a second chance, the policies underlying the doctrine of collateral estoppel—finality to litigation, prevention of needless litigation, avoidance of unnecessary expenditures of time and money, undesirability of inconsistent adjudications—outweigh the considerations raised by the union. As the Supreme Court has stated:

> After a party has had his day in court, with opportunity to present his evidence and his view of the law, a collateral attack upon the decision there rendered merely retries the issue previously determined. There is no reason to expect that the second decision will be more satisfactory than the first.

*Stoll v. Gottlieb*, 305 U.S. 165, 172, 59 S.Ct. 134, 138, 83 L.Ed. 104 (1938).[8]

The Board's determination that the union had committed an unfair labor practice will therefore be given collateral estoppel effect for purposes of the plaintiff's Section 303 claim.[9] See *International Wire v. Local 38,*

---

**8.** The NLRB's definition of the work in controversy, approved by the Second Circuit, has come under critical attack. See Note, *Work Recapture Agreements and Secondary Boycotts: ILA v. NLRB (Consolidated Express)*, 90 Harv.L.Rev. 815 (1977) ("The narrow view adopted in *Consolidated Express, Inc.* would restrict the collective bargaining process, thereby limiting its potential to ease the economic and social tension which accompany technological change.")

The Third Circuit has expressly declined to comment on the validity of the Rules in this Circuit. See *Sea-Land Service, Inc. v. Director, Office of Workers' Compensation Programs*, 552 F.2d 985 n. 5 (3rd Cir. 1977).

**9.** ILA charges that the Board's decision was motivated by policy considerations, rather than legal analysis. The Second Circuit, however, expressly based its enforcement of the Board's order on the sufficiency of the record to support the conclusion that the Rules on Contain-

*IBEW*, 475 F.2d 1078 (6th Cir.), *cert. denied*, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Texaco Inc. v. Operative Plasterers & Cement Masons International Union*, 472 F.2d 594 (5th Cir.), *cert. denied*, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973); *Paramount Transport Systems v. Teamsters Local 150*, 436 F.2d 1064 (9th Cir. 1971); *Painters District Council No. 38 v. Edgewood Contracting Co.*, 416 F.2d 1081 (5th Cir. 1969); *Eazor Express, Inc. v. General Teamsters Local 326*, 388 F.Supp. 1264 (D.Del.1975); *United Engineers and Constructors, Inc. v. International Brotherhood of Teamsters*, 363 F.Supp. 845 (D.N.J.1973).

## B. SECTION 303(b) ILLEGALITY DEFENSE.

The ILA argues that plaintiff's own wrongdoing bars recovery on its § 303(b) claim. The asserted defense is based on allegations that, during the relevant time period, plaintiff operated as a freight forwarder [10] without holding the license required under Part IV of the Interstate Commerce Act, 49 U.S.C. § 1001 *et seq.* Conex, for purposes of this motion, does not deny that it was operating as a freight forwarder without a license.[11] It argues instead that the defense of "illegality" is insufficient as a matter of law.

█ It is well settled that a charging party's violation of an unrelated statute is *not* a defense to the secondary boycott prohibitions of § 8(b)(4)(ii)(B). See, *e. g.*, *NLRB v. Springfield Building & Construction Trades Council*, 262 F.2d 494 (1st Cir. 1958). But a non-defense before the Board is not necessarily a non-defense to a § 303 private damage claim.

Section 303(b) reads, in pertinent part: [w]hoever shall be injured in his business or property . . . shall recover the damages by him sustained.

█ Although the damage action may tend collaterally to serve as a deterrent, Section 303(b) is purely compensatory in nature. See, *Teamsters Local 20 v. Morton*, 377 U.S. 252, 260, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964); *Sheet Metal Workers, Local 223 v. Atlas Sheet Metal Co.*, 384 F.2d 101 (5th Cir. 1967).

ers had no valid work preservation objective. That Court expressly disavowed the Board's "policy" rationale. Moreover, it rejected the Board's finding with respect to "abandonment" —the subject to which the ILA's newly discovered evidence relates.

**10.** The term "freight forwarder" means any person which (otherwise than as a carrier subject to chapters 1, 8, or 12 of this title) holds itself out to the general public as a common carrier to transport or provide transportation of property, or any class or classes of property, for compensation, in interstate commerce, and which, in the ordinary and usual course of its undertaking, (A) assembles and consolidates or provides for assembling and consolidating shipments of such property, and performs or provides for the performance of break-bulk and distributing operations with respect to such consolidated shipments, and (B) assumes responsibility for the transportation of such property from point of receipt to point of destination, and (C) utilizes, for the whole or any part of the transportation of such shipments, the services of a carrier or carriers subject to chapters 1, 8, or 12 of this title. 49 U.S.C. § 1002(a)(5).

**11.** 49 U.S.C. § 1010 provides, in pertinent part, (a)(1) No person shall engage in service subject to this chapter unless such person holds a permit, issued by the Commission, authorizing such service . . .

(3)(c) The Commission shall issue a permit to any qualified applicant therefor, authorizing the whole or any part of the service covered by the application, if the Commission finds that the applicant is ready, able, and willing properly to perform the service proposed, and that the proposed service, to the extent authorized by the permit, is or will be consistent with the public interest and the national transportation policy declared in this Act; . . .

According to the defendants, Conex applied for authority to provide freight forwarding services, but its application was denied by the Interstate Commerce Commission in January of 1971. The Commission's denial was based on Conex's failure to establish that its proposed services would be consistent with the public interest and the national transportation policy. The Commission also indicated that Conex was engaged in services without the required ICC authority. Consolidated Express, Inc., Freight Forwarder Application, ICC Docket FF–384 (Jan. 19, 1971). Exhibit 6 to Benkhardt Affidavit.

The record suggests that Twin Express never applied for an ICC license.

1034

If, as the ILA maintains, Conex's entire freight forwarding business is and was unlawful, Conex would have been, in legal contemplation, incapable of suffering any injury to its "business" by reason of the ILA's unfair labor practices. In slightly different terms, Conex, nonexistent in the eyes of the law, is entitled to no legal protection. Its contracts made in violation of the Interstate Commerce Act would be void and unenforceable. See *Shirks Motor Express Corp. v. Forster T & R Co.*, 214 Md. 18, 133 A.2d 59 (Md.Ct.App.1957).

■ Whether the issue is framed in terms of an illegality defense or a lack of standing to sue, the ILA's uncontradicted allegations that Conex was operating in flagrant violation of federal licensing law preclude a grant of summary judgment on the issue of liability under Section 303.

### C. STATUTE OF LIMITATIONS.

■ Defendant ILA has also raised a number of issues relating to statute of limitations. Both sides agree that, because Section 303 contains no statute of limitations, state law applies. See *Hyatt Chalet Motels, Inc. v. Carpenters Local 1065*, 430 F.2d 1119 (9th Cir. 1970); *International Union of Operating Engineers v. Fischbach & Moore, Inc.*, 350 F.2d 936 (9th Cir. 1965); *United Mine Workers v. Meadow Creek Coal Co., Inc.*, 263 F.2d 52 (6th Cir.), *cert. denied*, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038 (1959). Moreover, both sides agree that state law means the law of the forum state, that is, of New Jersey. See *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). At this point, concensus ends.

The ILA argues that application of state law means application of the whole law of New Jersey, including its choice of law rules. The ILA contends that New Jersey choice of law principles mandate application of Puerto Rico's one-year statute of limitations. Plaintiff, on the other hand, urges that application of state law in this context means application only of the internal law of the state and that, even if New Jersey choice of law principles are deemed applica-

ble, they dictate choice of New Jersey's own six-year limitations period.

Whether in federal question cases, where the court is referred to state law, the state's choice of law rules must also be applied is a question to which the Supreme Court has alluded, but which it has never resolved. See, *e. g.*, *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 705 n. 8, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *De Sylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 371 n. 2, 65 S.Ct. 405, 89 L.Ed. 305 (1945); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Some courts faced with the issue have resolved it simply by citation to *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). See, *e. g.*, *Robbins v. Bostian*, 138 F.2d 622 (8th Cir. 1943). But language in a number of Supreme Court cases suggests that *Klaxon* has no relevance. *Levinson v. Deupree*, 345 U.S. 648, 651, 73 S.Ct. 914, 97 L.Ed. 1319 (1953); *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). See also *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 471–472, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (Jackson, J., concurring).

*Klaxon* holds that a federal court in a diversity case is bound to follow the choice of law rules of the forum state. In diversity cases, the federal court sits as a state court, and the *Klaxon* rule insures fulfillment of the uniformity principle declared in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The considerations underlying the *Klaxon* rule have little or no relevance in the federal question context. In such cases, state limitations are applied only to fill a void. In failing to enact its own limitations period,

> Congress could not have intended an unlimited period for enforcement as would otherwise exist in actions at law, and that, selection of a period of years not being the kind of thing judges do, federal judges should borrow the limitation[s] statutes of the states where they sit. . . . In this area, as contrasted with diversity litigation, federal interests transcend

those of the states; state limitation statutes and doctrines are utilized to effect federal, not state, policy

. . . . .

*Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 83–84 (2nd Cir. 1961).

■ Application of state choice of law principles where the issue is the limitations period for commencement of a federal cause of action furthers no federal interests. On the contrary, modern choice of law principles, like New Jersey's interest analysis, have been developed to insure that in cases where there are multi-state factual contacts and where the legal issues will be resolved on the basis of state substantive law, the policies of all potentially interested states will be furthered or, at minimum, not frustrated. See, *e. g., Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28 (3rd Cir. 1975); *Mellk v. Sarahson*, 49 N.J. 226, 229 A.2d 625 (1967); *Pfau v. Trent Aluminum Co.*, 55 N.J. 511, 263 A.2d 129 (1970). In the instant case, however, the interests we seek to protect are federal ones which state choice of law principles are not designed to further.[12]

■ Accordingly, I hold that New Jersey's own six-year limitation applies and that the cause is not timebarred.

D. ACCRUAL, LACHES AND ESTOPPEL EN PAIS.

Defendant ILA also contends that plaintiff's cause of action accrued in 1969 when the Rules on Containers were first promulgated. Thus it argues that the action is timebarred even under New Jersey's six-year limitations statute. Both plaintiff and

the ILA cite *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) as controlling. *Zenith*, an action involving Sherman and Clayton Act claims, sets forth the general rule on accrual of actions.

> The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is "commenced within four years after the cause of action accrued," 15 U.S.C. § 15(b), plus any additional number of years during which the statute of limitations was tolled. Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws, such as the conspiracy in the instant case, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

*Id.*, at 338, 91 S.Ct., at 806.

The ILA attempts to avoid the import of this language by arguing that in this case, Conex has not pleaded any individual acts, but only the 1969 Rules on Containers. A reading of the complaint undermines this claim. Conex claims injuries resulting from *enforcement* of the Rules on Containers pursuant to the Dublin Supplement of 1973. It seeks to *recover* damages for particular acts—refusal to supply containers, pass-through of fines, and unnecessary dockside

---

**12.** However, the Supreme Court has stated that, in choosing between two arguably applicable limitations statutes of the forum state there is no reason to reject the characterization that state law would impose unless the characterization is unreasonable or inconsistent with national labor policy. *UAW v. Hoosier Cardinal Corp., supra*, 383 U.S., at 706, 86 S.Ct., at 1113 (1966). Where the forum state itself has several limitations of statutes, the court has no option but to choose among them. However, choosing among limitations periods of several states according to the forum's choice of law principles introduces a host of unnecessary complexities. State choice of law rules for selection of an appropriate statute of limitations are explored in *Heavner v. Uniroyal, Inc.*, 63 N.J. 130, 140–141, 305 A.2d 412 (1970), and *Allen v. Volkswagen of America, Inc.*, 555 F.2d 361 (3rd Cir. 1977). Attempting to apply these rules where the cause of action is federal is like fitting a round peg in a square hole. The most sensible thing to do, if the case law would permit it, would be for the federal courts to develop federal statutes of limitations, as a matter of federal common law, to fill the void.

stuffing and stripping—which occurred within six years of the filing of the complaint. Conex does not, and may not, seek damages which flowed from acts which occurred prior to August 20, 1970. *Cf. United States v. Sea-Land Service,* 424 F.Supp. 1008 (D.N.J.1977) (in suit for recovery of penalties for violation of Federal Maritime Commission tariffs by refusal to supply containers, "each decision to withhold requested containers" was an independent act).

ILA also argues estoppel *en pais,* laches, and equitable estoppel. These equitable theories are invoked based on ILA's claims that Conex intentionally avoided challenging the Rules on Containers when they were first implemented because, in fact, Conex thrived on their existence: watching the enforcement of the Rules drive its competitors out of business while developing techniques, including bribery of dock bosses and alteration of shipping documents, to evade the Rules' strictures.

 Although the Court's research has unearthed no case law indicating that these equitable defenses may be raised as a bar to a Section 303 damage claim,[13] the strict compensatory nature of the 303 action suggests that if, in fact, the challenged acts and practices caused no injury to the business of the plaintiff, no recovery is permissible. In my view, a fuller development of the record, including exploration of the union's claims that Conex itself engaged in illegal conduct in order to circumvent the Rules, is required before the Court can rule on this aspect of the case. Summary judgment must therefore be denied on these equitable grounds as well as on the ground of illegality.

## III. THE SHERMAN ACT CLAIMS

## COUNT I

Conex asserts also that the determinations of the NLRB "unequivocally establish the existence of a group boycott or concert-

ed refusal to deal." The defendants argue against application of the doctrine of collateral estoppel because, *inter alia,* (1) it would deprive them of their right to a trial by jury; (2) it would frustrate the policy of the federal antitrust laws that exclusive jurisdiction of antitrust claims be vested in the federal courts; and (3) it is inappropriate because there is no identity of issues, no privity, and no opportunity for a full and fair hearing. Defendants argue further that the Rules on Containers are immune from antitrust attack by reason of the labor exemption to the antitrust laws. They argue also that, even if there be no complete immunity, the rule of reason must be applied to determine whether there has been a violation of the Sherman Act. Finally, the defendants raise a number of claims which may be styled affirmative defenses: *i. e.,* the illegality of the plaintiffs' own operations, and the primary and exclusive jurisdiction of the Federal Maritime Commission.

## A. LABOR LAW AND ANTITRUST.

In my view, the issues of collateral estoppel, labor exemption and *per se* rule or rule of reason are inseparable. At the heart of each lies the so-called labor exemption to the antitrust law.

 It is a commonplace that the antitrust laws and the labor laws are antithetical. The antitrust laws are designed to promote competition; the unions are in the business of limiting it. It has fallen largely to the courts to work out a proper conciliation of these competing desiderata.

While the conflict between labor and antitrust policies begins much earlier, the modern era is often said to begin with *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The Supreme Court there held that a union does not violate the Sherman Act by engaging in a violent primary sit-down strike. In Justice Stone's famous *dictum,* the Sherman Act

---

**13.** In *Falsetti v. U.M.W.,* 355 F.2d 658 (3rd Cir. 1966), the court suggested, in *dicta,* that the equitable doctrine of laches could bar a § 301 claim. See also *United States v. Georgia Pow-* *er Co.,* 474 F.2d 906 (5th Cir. 1973) (equitable doctrine of laches is applicable to suit under Civil Rights Act of 1964.)

was aimed only at "some form of restraint upon commercial competition in the marketing of goods or services;" *Id.* at 495, 60 S.Ct. at 993, it was not directed toward an elimination of price competition in the labor market.

One year after *Apex*, Justice Frankfurter wrote the Court's decision in *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). *Hutcheson* involved a jurisdictional dispute between two unions over a work assignment by Anheuser-Busch. The union that did not get the assignment organized a strike among the employees of certain contractors erecting a building for Anheuser, and a boycott of Anheuser beer by union members and friends. Under the precedent of the time, this was a Sherman Act violation. Justice Frankfurter, however, examined the anti-injunction provisions of the Clayton and Norris-LaGuardia Acts and announced that activity immunized against injunction by those two statutes could not constitute a substantive offense under the Sherman Act.

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.*, at 232, 61 S.Ct., at 466 (footnote omitted). Unlike Justice Stone, who declared in *Apex Hosiery* that the Sherman Act as such did not cover restraints in the labor market, Justice Frankfurter, in *Hutcheson*, created an *exemption* from the antitrust laws for unions "acting alone".

The corollary of this principle was that labor unions lose their immunity when they "aid nonlabor groups to create business monopolies and to control the marketing of goods and services." In *Allen Bradley Co. v. IBEW Local 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), a union, in the interest of obtaining better wages, hours, and working conditions, induced electrical contractors to agree to use only equipment manufactured by firms having contracts with the union. The Supreme Court rejected the Second Circuit's view that, so long as the union was acting only in its own self-interest, and through means sanctioned by the Clayton Act, it was immune from antitrust sanctions. The Court instead appeared to adopt another *per se* rule: immunity is lost when a labor group is acting to "aid and abet businessmen" in conduct which, if engaged in by businessmen alone, would violate the Sherman Act. Immunity was not achieved merely because the union, acting for its own ends, was the moving force behind the arrangement; if manufacturers agreed, albeit unwillingly and under union pressure, to engage in joint action violative of the Sherman Act arranged by the manufacturers alone, then the union, and presumably the manufacturers, were in violation.

Two important cases were decided in 1965: *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) and *Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). In *Pennington*, by way of a counterclaim, a small coal producer sued the United Mine Workers alleging violation of the Sherman Act in the UMW's contract agreement with an association representing large mine operators. The challenged agreement embodies substantial wage concessions by the employers and acceptance by the union of increased mechanization. The union also agreed to impose identical wage terms on smaller non-union coal operators irrespective of those operators' ability to pay such wages. The Supreme Court split three ways on the issue of the UMW's exemption from antitrust liability. The opinion of the Court, delivered by Justice White, held that an agreement resulting from collective bargaining is not automatically exempt from Sherman Act scrutiny merely because the negotiations covered wage standards or other subjects of compulsory bargaining. Expressing displeasure with the agreement at issue, the Court noted that nothing in federal labor policy indicates that a union and employers in one bargaining unit are free to bargain

about wages or working conditions in other bargaining units or to settle those questions for the entire industry. In the Court's view, such agreements were clearly contrary to the interests of the union and its duty to bargain unit by unit.

The union's obligation to its members would seem best served if the union retained the ability to respond to each bargaining situation as the individual circumstances might warrant, without being strait-jacketed by some prior agreement with the favored employers.

*Id.,* at 666, 85 S.Ct., at 1591.

Justice Douglas' opinion, concurred in by Justices Black and Clark, agreed with the result, but emphasized that a wrongful intent is required for antitrust liability. The concurrence noted that the jury should be instructed that "if there were an industry-wide collective bargaining agreement whereby employers and the union agreed on a wage scale that exceeded the financial ability of some operators to pay and that *if it was made for the purpose of forcing some employers out of business,* the union as well as the employers who participated in the arrangement with the union should be found to have violated the antitrust laws." *Id.,* at 672–673, 85 S.Ct., at 1595 (emphasis added).

Justice Goldberg, joined by Justices Harlan and Stewart, dissented from the opinion but concurred in the result in a single opinion written for *Pennington* and *Jewel Tea.*

*Jewel Tea* involved a challenge to a butchers union multi-employer agreement which restricted the hours for sale of meat to from 9:00 A.M. to 6:00 P.M. Jewel Tea, a grocery chain wishing to maintain night operations, entered into the agreement under threat of strike but thereafter sued the union and the employers who negotiated the agreement for violation of the Sherman Act. Again, the Court split three ways. Justice White, Chief Justice Warren and Justice Brennan framed the issue as "whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful at-

tempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act." *Id.,* at 689–690, 85 S.Ct., at 1602. The Court noted that "the effect on competition is apparent and real, perhaps more so than in the case of the wage agreement," and that the collective bargaining agreement was a "combination" between union and employers. *Id.,* at 691, 85 S.Ct., at 1603. Mechanical application of *Allen Bradley* would have rendered the conduct unlawful and the *Hutcheson* "acting alone" theory was inapplicable. Nevertheless, the Court found an exemption implied by the statutes setting forth the national labor policy. Hours of operation had been a historic concern of the butchers' union and there were indications that night operations would alter the character of the work itself. In that context, hours of operation were sufficiently related to wages, hours, and working conditions to fall within the proper scope of collective bargaining. The agreement was thus exempt from antitrust attack.

Justice Douglas, with whom Justices Black and Clark concurred, reasoned that, because the employers could not themselves agree on hours of operations, the union, by joining with them, exceeded the *Allen Bradley* rule and lost its exemption.

Justice Goldberg wrote an opinion, for both *Pennington* and *Jewel Tea,* in which he was joined by Justices Harlan and Stewart. He took the position that the agreements in both cases dealt with mandatory subjects of collective bargaining. As such, they were immune from antitrust attack. Justice Goldberg viewed the Court's decision as a denial of the right to consider legitimate subjects in the bargaining process and a frustration of the collective bargaining process itself. He deemed the Court's decision in both cases a throwback to past days when courts allowed antitrust actions against unions and employers engaged in conventional collective bargaining,

because "a judge considered" the union or employer's conduct in question to be "socially or economically" objectionable.

The most recent Supreme Court pronouncement on the thorny issue of reconciliation of labor and antitrust law is *Connell Construction Co. v. Plumbers & Steamfitters, Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Plumbers Local 100 represented workers in the plumbing and mechanical trades in Dallas. It had successfully used picketing to force a number of general contractors to agree to subcontract work in the trade only to subcontractors which had collective bargaining agreements with the union. Connell, a general contractor, filed suit in Texas State Court to have the picketing enjoined under state antitrust law. After Local 100 removed to federal court, Connell signed the subcontracting agreement under protest, then sued for violations of Section 1 of the Sherman Act.

Justice Powell wrote for the majority and held that the Clayton statutory exemption was not available because the arrangement involved both labor and nonlabor groups. He further held that the *Jewel Tea* "non statutory" exemption which may arise by implication and which has its source in the strong labor policy favoring the association of employers to eliminate competition over wages and working conditions was unavailable because the union did not represent or seek to represent Connell's employees. The nonstatutory exemption offers no protection when a union and a non-labor party agree to restrain directly competition in a business market, even if the union's organization objective is lawful. The Court, finding the activity non-exempt, remanded for consideration of whether the agreement violated the antitrust act. In doing so, however, and in explaining Connell's secondary holding that the state antitrust laws were preempted by federal antitrust laws, the majority, citing *Apex Hosiery*, noted that

> Congress and this Court have carefully tailored the antitrust statutes to avoid conflict with the labor policy favoring lawful employee organization, not only by

delineating exemptions from antitrust coverage but also by adjusting the scope of the antitrust remedies themselves.

*Id.*, at 636, 95 S.Ct., at 1842.

The dissenting views of Justices Stewart, Douglas, Brennan, and Marshall were expressed in an opinion by Justice Stewart. The dissenters believed that the picketing at Connell's site was secondary activity because it was designed to induce Connell to agree to subcontract only to firms which had signed collective bargaining agreements with Local 100; the union had no desire to organize or represent Connell's employees. Thus it was proscribed secondary activity, "subject to detailed and comprehensive regulation pursuant to § 8(b)(4) of the National Labor Relations Act . . . and § 303 of the Labor Management Relations Act . . . . Similarly, the subcontracting agreement under which Connell agreed to cease doing business with nonunion mechanical contractors was governed by the provisions of § 8(e) of the National Labor Relations Act." In the view of the dissenters, legislative history unmistakably demonstrated that in regulating secondary activity, "Congress [had] selected with great care the sanctions to be imposed if proscribed union activity should occur." In so doing, Congress rejected efforts to give private parties injured by union activity such as that engaged in by Local 100 the right to seek relief under federal antitrust laws." *Id.*, at 639, 95 S.Ct., at 1843. Justice Douglas joined in the dissent, but also wrote separately to indicate that the result might be different if Connell alleged or attempted to show a conspiracy between Local 100 and the subcontractors, rather than coercion of the employer by the union. *Id.*, at 638, 95 S.Ct. 1830.

One final Supreme Court decision must be examined before attempting to place the instant case in the precedential framework. That case is *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), a product boycott-work-preservation case, involving a strike by carpenters who, acting pursuant to their collective bargaining agreement,

refused to hang prefitted doors. The National Woodwork Manufacturers Association filed charges with the NLRB against the union alleging that by including the "will not handle" prefitted doors clause in the collective bargaining agreement, the union had committed the unfair labor practice under § 8(e) of entering into an agreement whereby the employer agrees to cease or refrain from handling any of the products of any other employer, and alleging further that in enforcing the sentence, the union committed the unfair labor practice under § 8(b)(4)(B) of forcing or requiring any person to cease using the products of any other manufacturer. The NLRB dismissed the charges adopting the findings of the Trial Examiner to the effect that the contract provision and its enforcement by the union were primary activity outside the proscriptions of §§ 8(e) and 8(b)(4)(B). See also, *NLRB v. Enterprise Association*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

The Court of Appeals for the Seventh Circuit reversed. It held that the will not handle agreement violated § 8(e) without regard to any "primary" or "secondary" objective. In the Court's view, the contract clause was designed to effect a product boycott like the one condemned in *Allen Bradley*, and Congress meant, in enacting §§ 8(e) and 8(b)(4)(B) to prohibit such agreements and conduct forcing employers to enter into them. Nevertheless, the court sustained the dismissal of the § 8(b)(4)(B) charge, agreeing that the union's conduct as to the struck contractor involved only a primary dispute protected by the proviso that "nothing contained in this clause (B) shall be construed to make unlawful, [where not otherwise unlawful,] any primary strike or primary picketing . . ."

The Supreme Court held that § 8(b)(4)(A), the predecessor of § 8(b)(4)(B), was directed only at secondary activity, that is, it was meant to protect the employer only from union pressures designed to

involve him in disputes not his own. *National Woodwork Manufacturers Ass'n v. NLRB*, 386 U.S. at 625–626, 87 S.Ct. 1250. The Court rejected the Association's argument that *Allen Bradley* compelled a finding that the enforcement of the "will not handle" clause violated § 8(b)(4)(B). The Court explained *Allen Bradley* as follows:

. . . [T]he boycott of out-of-state electrical equipment by the electrical contractors' employees was not in pursuance of any objective relating to pressuring their employers in the matter of *their* wages, hours, and working conditions; there was no work preservation or other primary objective related to the union employees' relations with their contractor employers. On the contrary, the object of the boycott was to secure benefits for the New York City electrical manufacturers and their employees. "This is a secondary objective because the cessation of business was being used tactically, *with its eye to its effect on conditions elsewhere.*" . . . [T]he fact is that the boycott in *Allen Bradley* was carried on, not as a shield to preserve the jobs of Local 3 members, traditionally a primary labor activity, but as a sword, *to reach out* and monopolize all the manufacturing job tasks for Local 3 members. It is arguable that Congress may have viewed the use of the boycott as a sword as different from labor's traditional concerns with wages, hours, and working conditions. *But the boycott in the present case[s] was not used as a sword; it was a shield carried solely to preserve the members' jobs.* We therefore have no occasion today to decide the questions which might arise where the workers carry on a boycott to reach out to monopolize jobs or acquire new job tasks when their own jobs are not threatened by the boycotted product.[14]

*Id.*, at 629–631, 87 S.Ct., at 1260 (footnotes omitted) (emphasis added). In a footnote

---

14. This is of course the question addressed by the NLRB and determined adversely to the union in this case. The language of *National Woodwork*, however, suggests to me that the NLRB and Second Circuit were wrong: the

jobs of the ILA members *were* threatened by the boycotted product and the union activities were not used as an *Allen Bradley* sword to influence labor relations of a different employer.

which succinctly states the problem which now confronts this Court, the majority stated:

> We likewise do not have before us in these cases, and express no view upon, the antitrust limitations, if any, upon union-employer work-preservation *or* work-extension agreements. See *United Mine Workers of America v. Pennington* . . .

*Id.,* at 631, n. 19, 87 S.Ct., at 1261 (emphasis added). Justice Harlan concurred but took pains to point out that:

> In view of Congress' deep commitment to the resolution of matters of vital importance to management and labor through the collective bargaining process, and its recognition of the boycott as a legitimate weapon in that process, it would be unfortunate were this Court to attribute to Congress, on the basis of such an opaque legislative record, a purpose to outlaw the kind of collective bargaining and conduct involved in these cases.

*Id.,* at 649–650, 87 S.Ct., at 1271. Justice Stewart, joined by Justices Black, Douglas and Clark, dissented.

■ The NLRB decision in this case, affirmed by the Second Circuit, establishes that the Rules on Containers and the enforcement of those rules constituted secondary work acquisition outside the protected scope of *National Woodwork Co.* and proscribed by § 8(b)(4) an § 8(e). Conex maintains that the Board's findings also establish the occurrence of a group boycott or concerted refusal to deal, *per se* violations of the antitrust laws. Although the Court has decided that the NLRB adjudication is determinative of the labor law issues, *supra,* at 9, that determination is not dispositive of the antitrust claims. In short, the Supreme Court precedent indicates that conduct described as secondary, and thus proscribed by

the labor laws, does not *ipso facto* constitute conduct violative of the antitrust laws. In fact, the labor context in which the antitrust claims arise itself militates against the facile conclusion that there is a remedy under the antitrust laws.

It is clear that this case does not fall within the statutory antitrust exemption of *Hutcheson* ; the ILA was not acting alone.

It is somewhat less clear that the instant case should not be governed by *Allen Bradley.* *Allen Bradley* may be read for the proposition that a boycott which directly restricts competition, and which is brought about by a combination of unions and employers, is a *per se* violation of the Sherman Act. But the development of the law did not stop with *Allen Bradley,*[15] and much has occurred since that 1945 decision was written.

■ *Pennington* and *Jewel Tea* establish that contracts addressing mandatory subjects of collective bargaining and negotiated in the union's self-interest are immune from antitrust attack, at least where the intent of the parties is not blatantly anticompetitive. I believe that this is such a contract.

Whether the ILA's interest in containerization is characterized as work preservation, work acquisition, or work reacquisition, it is beyond dispute that this technological change in the industry and its direct effect on the job security of the longshoremen has been at the very center of labor relations on the waterfront for many years. It posed a serious threat of lost jobs, lost work opportunities, reduced earnings, and reductions in gang size and daily work time to the ILA. A duty to bargain collectively on the subject is imposed by 29 U.S.C. § 158, and the union here was acting to preserve the jobs of its members.

**15.** Even *Allen Bradley* may be read more narrowly as simply holding that the non-statutory exemption is unavailable, but that the activity may still be beyond the scope of the antitrust laws. And certain language in *Allen Bradley* suggests that a union commits an antitrust violation only when it participates in a pre-existing employer conspiracy.

Interestingly, the *Allen Bradley* court treated the situation as if the union had merely joined an already existing conspiracy of employers, while the facts of the case strongly suggest that the union had masterminded the plan.

The negotiations which resulted in the Rules on Containers were not only encouraged—but participated in—by a Presidentially-appointed mediator. As early as 1964, a report by the Secretary of Labor stressed the importance of collective bargaining as the means to resolve the "innovation-work preservation" problems which were of critical concern to the longshoremen, to the industry, and to the nation. The 1968 report to the President of the United States by the Board of Inquiry created by Executive Order 11431 stressed the importance of negotiation.

The economic interests of the industry and the employees are in conflict, and the parties in the course of two months of negotiations have not been able to reconcile their respective interests. Unless the positions of one or both parties is substantially changed, this dispute may persist indefinitely.

The Rules at issue were themselves worked out with the aid of an advisor appointed by the President after a long strike following an 80-day Taft-Hartley cooling-off period. Affidavit of Thomas W. Gleason, May 1, 1977, ¶ 34. Affidavit of James J. Dickman, April 12, 1977, Ex. 4.

Moreover, the Rules were put into effect during a period when all official indications suggested that they were legitimate. In *International Container Transport Corp. v. NYSA [ICTC]*, 426 F.2d 884 (2nd Cir. 1970), the Court of Appeals for the Second Circuit reversed a grant of preliminary injunctive relief on an antitrust claim, holding that there was little possibility of success on the merits in light of the fact that the ILA was acting in its own self-interest, and citing *Hutcheson* and *Allen Bradley*. In 1969, the Regional Director of the NLRB refused to issue a Board complaint on the ground that the Rules were valid work preservation under *National Woodwork*.

In this context, a finding of *per se* antitrust liability seems fundamentally inequitable and fundamentally at odds with the Supreme Court's decision indicating that the policies of the antitrust acts must be balanced against those reflected in the labor laws.

The decisions of the lower courts which have addressed analogous issues are instructive: none has found a *per se* antitrust violation simply because the challenged actions were found to be outside of either the statutory or implied labor exemptions to the antitrust laws. See *Republic Productions, Inc. v. American Federation of Musicians*, 245 F.Supp. 475 (S.D.N.Y.1965); *National Dairy Prod. Corp. v. Milk Drivers & Dairy Employees*, 308 F.Supp. 982 (S.D.N.Y. 1970). The decision of the Second Circuit in *Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793 (2nd Cir. 1977), deserves close attention.

Commerce Tankers, for economic reasons, attempted to sell its last remaining vessel to Vantage Steamship Corp. The National Maritime Union, which represented the seamen on the vessel, objected to the sale because Commerce had not obtained a commitment from Vantage to continue the NMU as bargaining representative in accordance with a provision of NMU's collective bargaining agreement with Commerce. NMU first obtained an injunction against the sale in federal district court. That injunction was reversed after the Regional Director of the NLRB, in a § 10(*l*) NLRA application, alleged that there was reasonable cause to believe the clause violated § 8(e) of the NLRA. That determination was later confirmed by the NLRB and upheld by the Second Circuit on appeal. Commerce and Vantage then sued NMU alleging its conduct violated both the NLRA and the Sherman Act. The district judge found that the proximate cause of any damage was the original injunction against the sale and limited recovery to the injunction bond posted by NMU.

The Court of Appeals reversed and remanded for consideration of the Sherman Act claims.

[Commerce and Vantage] ask us . . . to hold that the restraint-on-transfer clause would not be exempt from the antitrust laws under the standards established by *Connell* . . . and that the agreement constitutes a group boycott

and is illegal per se under section 1 of the Sherman Act (citation omitted). Both these assertions raise extremely complex and significant questions on the interaction between the federal labor and antitrust laws. The accommodation of the conflicting policies reflected in these laws has aptly been called "a troublesome and unruly issue." See Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U.Chi.L.Rev. 659 (1965). *Connell* indicates that a "nonstatutory" exemption from the antitrust laws in this case . . . turns upon whether the restraint-on-transfer clause was a "direct restraint on the business market . . that would not follow naturally upon the elimination of competition over wages and working conditions," . . . and whether the inclusion of the clause in "a lawful collective-bargaining agreement" shelters the NMU because of the "federal policy favoring collective bargaining . . ." *And we do not believe that our prior holding that the clause violated § 8(e) necessarily determines that antitrust issue, although it lends support to appellants' position. And even if the "nonstatutory" exemption does not apply, there is at least a substantial question whether a per se approach under the antitrust law is applicable in the case of a non-exempt labor activity.*

*Id.*, at 801–802 (footnotes omitted) (emphasis supplied).

The Court then quotes Professor Milton Handler:

This brings us to the question of antitrust liability where union activity is held to be non-exempt. The principal danger of these recent rulings is that a finding of antitrust liability will automatically be made whenever the challenged conduct is held to be non-exempt. This would be a *per se* approach with a vengeance. Arrangements may fall outside the scope of mandatory bargaining and yet have no adverse effect on competition. We still must find whether the agreement restrains trade and whether the restraint is unreasonable. A fair reading of *Jewel Tea* . . . satisfies me that the

Court intended that there be a full-scale rule of reason inquiry in every instance in which a non-exempt activity is claimed to be in violation of antitrust. Handler, Labor and Antitrust: A Bit of History, 40 Antitrust L.J. 233, 239–240 (1971).

*Id.*, at 802, n. 8. See also T. St. Antoine, Secondary Boycott: From Antitrust to Labor Relations, 40 Antitrust L.J. 242, 256 (1971). ("Yet even if forbidden under the NLRA, a work acquisition clause has strong labor market overtones, and is thus arguably free of antitrust implications under the *Apex* test.)

■ Implicit rejection of the *per se* approach also helps to explain the confusion otherwise engendered by the co-existence of the opinion in *CTC v. NYSA*, and the Second Circuit's affirmance of the Board's order in *ILA v. NLRB*. Affirming the NLRB decision which our plaintiff argues should be given collateral estoppel effect in this case, the Second Circuit referred to *ICTC* this way:

Admittedly, the rationale given by the court was that in such agreement ILA was acting in its self-interest with the object of preserving for its members work traditionally performed by them as longshoremen. However, Judge Hayes' opinion . . . carefully distinguishes an action (such as the instant one) which is within the exclusive jurisdiction of the NLRB and which is "based on different allegations and seeking an entirely different remedy, [where] the court must defer to the Board."

*ILA v. NLRB*, 537 F.2d 706, 708 n. 1 (2nd Cir. 1976). See also *International Association of Heat & Frost Insulators v. United Contractors Ass'n*, 494 F.2d 1353 (3rd Cir. 1974), *amending* 483 F.2d 384 (3rd Cir. 1973). Thus summary judgment is denied on the Sherman Act claims. Even if the NLRB determination of unlawful work acquisition is given collateral estoppel effect in the § 303 context, that determination does not foreclose the antitrust inquiry. A *per se* approach is inappropriate in these circumstances given the sensitive balancing

that must be done to reconcile competing labor and antitrust interests, given the failure of the Supreme Court to articulate a coherent theory adopted by a majority of Justices, given the general trend away from the application of the *per se* rules, and given the fact that, although the agreement has been adjudicated impermissible under the labor laws, it was clearly grounded, at least in part, in the unions perceived goal of protecting the interests of its members vis-a-vis their own employers, and was given at least initial validation by the executive and judicial branches.

Under these circumstances, trial of the issues of anticompetitive intent and anticompetitive effect is warranted. Summary judgment will, accordingly, be denied.

## B. THE ILLEGALITY DEFENSE.

Although this is sufficient to resolve the motions now pending, interests of judicial economy suggest that the Court now address the asserted defense to the antitrust claim of illegality and primary and exclusive jurisdiction of the National Maritime Commission.

All of the defendants argue that plaintiff's own wrongdoing bars recovery on its antitrust claims. The defense, like the ILA's asserted defense to the Section 303 claim, is based on allegations that, during the relevant time period, plaintiff operated as a freight forwarder without holding the license required under Part IV of the Interstate Commerce Act, 49 U.S.C. §§ 1001 *et seq.* To reiterate, plaintiff, for purposes of this motion, does not deny that it was operating without a license. It argues instead that the asserted defense of "illegality" is insufficient as a matter of law.

The Supreme Court has noted the inappropriateness of invoking broad common law barriers to relief where a private suit serves important public purposes. Thus, in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), the court held that plaintiff's participation in an unrelated antitrust conspiracy was no bar to its suit for treble damages.

If petitioner and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of petitioner, however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured.

*Id.,* at 214, 71 S.Ct., at 261. In *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), the court held that the doctrine of *in pari delicto* would not bar plaintiff's recovery on an antitrust claim. *Perma Life* was a suit brought by a number of Midas dealers against Midas and its parent corporation. Plaintiffs charged that their dealership agreements with Midas contained provisions for tie-ins, resale price maintenance, exclusive dealing, and territorial restrictions which allegedly contravened federal antitrust law. The district court and the court of appeals ruled in favor of the defendants. The plaintiffs had enthusiastically accepted the agreements and had reaped their benefits; they would not be heard to complain that the agreements were illegal.

The Supreme Court reversed. Justice Black's lead opinion noted that plaintiffs' conduct may have been "morally reprehensible," but that the law nevertheless encourages their suit to further the overriding public policy in favor of competition.

A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement. And permitting the plaintiff to recover a windfall gain does not encourage continued violations by those in his position since they remain fully subject to civil and criminal penalties for their own illegal conduct.

*Id.,* at 139, 88 S.Ct., at 1984. Justice White concurred in the judgment, but stated that resolution of these kinds of cases should focus on the purpose of the Clayton treble-damage provision: recovery to private plaintiffs *injured* by conduct violative of

the antitrust laws. Justice Fortas also concurred in the result, but thought that the doctrine of *in pari delicto* could apply where the fault of the parties was indeed of equal magnitude; he did not think that this was such a case. Justice Marshall concurred in the judgment but felt that the principle that a wrongdoer shall not be permitted to profit through his own wrongdoing is fundamental to our jurisprudence. In his view, the public interest does not require that a plaintiff who has actively sought to bring about illegal restraints for his own benefit be permitted to demand redress in the form of treble damages from a partner no more responsible for the existence of the illegality than the plaintiff. This, in his view, was not such a case. Justice Harlan, with whom Justice Stewart joined, thought that *in pari delicto* was a proper defense to an antitrust claim, but that the lower courts had improperly applied the doctrine.

In the instant case, plaintiff's alleged wrongdoing is neither participation in the antitrust violation which is the subject of the suit nor participation in an unrelated anticompetitive scheme. Defendants here charge that plaintiff was operating in violation of a completely independent federal regulatory scheme.

Some courts have viewed such an asserted defense as no more than a species of *in pari delicto* and they have rejected it on the authority of *Kiefer-Stewart* and *Perma Life*. In a leading case, *Semke v. Enid Automobile Dealers Ass'n*, 456 F.2d 1361 (10th Cir. 1972), plaintiff, a licensed used car dealer, sued defendant new car dealers charging that they had conspired to prevent plaintiff from furnishing new cars to its customers. Defendants asserted that plaintiff was not licensed under state law to sell new cars. The court examined the public interest which the state licensing scheme sought to protect, but concluded that "the policy values inherent in the antitrust statutes . . . clearly outweigh any social value flowing from a state licensing statute." *Id.*, at 1370.

In *Health Corporation of America, Inc. v. New Jersey Dental Ass'n*, 424 F.Supp. 931 (D.N.J.1977) (Brotman, J.), plaintiffs were designers and administrators of dental health programs for groups such as unions. By judicial decision and administrative action, they had been found to be operating in violation of the New Jersey Dental Service Corporation Act and the New Jersey Dental Practice Act. They sued defendant dental associations charging, *inter alia*, that the defendants had conspired to monopolize the delivery of dental health care by instituting sham lawsuits and administrative proceedings, and through threats, harassment, coercion and dissemination of misinformation to induce dentists not to contract with plaintiffs. Defendants raised the plaintiffs' unlawful operation as a bar to the antitrust suit. The court rejected the asserted defense. The court discussed *Kiefer-Stewart* and *Perma Life*, and it pointed out that the administration of dental health care programs is neither criminal nor contrary to public policy. It noted that plaintiffs could bring their activities within the law with some operational changes and were attempting to do so. The court concluded:

> Plaintiffs claims will not be dismissed because they were in violation of state statutes. The state has enforced its statutes. This court will not impose an additional penalty.

*Id.*, at 934. See also *Adolph Coors Co. v. A & S Wholesalers, Inc.*, 1975–1 Trade Cas. ¶ 60,187 (D.Colo.1975), *aff'd*, 1977–2 Trade Cas. ¶ 61,565 (10th Cir. 1977) (alleged violations of state and federal licensing laws); *Schnapps Shop, Inc. v. H. W. Wright & Co., Ltd.*, 377 F.Supp. 570 (D.Md.1973) (violation of state unfair sales act); *Lamp Liquors, Inc. v. Adolph Coors Co.*, 563 F.2d 425 (10th Cir. 1977), *rev'ng* 410 F.Supp. 536 (D.Wyo. 1976) (violation of state liquor licensing laws); *cf. Memorex Corp. v. International Business Machines Corp.*, 555 F.2d 1379 (9th Cir. 1977) (unlawful market presence no bar).

Some courts, on similar facts, have reached a contrary conclusion. *American Bankers Club, Inc. v. American Express Co.*, 1977–1 Trade Cas. ¶ 61,247 (D.D.C.1977) was a suit by a plaintiff who charged that de-

fendants had conspired to frustrate his attempts to enter the travelers check market. The court dismissed its claims, holding that the interest bearing travelers checks which plaintiff sought to market would violate federal banking laws. Accordingly, plaintiff was deemed not to have any business or property interest in marketing such checks and thus no right to recovery under the antitrust laws.

In an early case, *Maltz v. Sax*, 134 F.2d 2 (7th Cir.), *cert. denied*, 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720 (1943), the manufacturer of gambling devices instituted an antitrust suit. Although no federal statute prohibited manufacture or sale of such devices, use of gambling apparatus had been condemned as violative of the Federal Trade Act and gambling had been held, in other contexts, to be against public policy. The court foreclosed recovery on alternative grounds of unclean hands and "no legal right." See also *Heath v. Aspen Skiing Corp.*, 325 F.Supp. 223 (D.Colo.1971) (ski instructor who had no use permit from the U. S. Forest Service could not prevail in antitrust action against Forest Service permittees who had refused to allow him to conduct a ski school at the ski areas they operated); *Cottonwood Mall Shopping Center, Inc. v. Utah Power & Light Co.*, 440 F.2d 36 (10th Cir.), *cert. denied*, 404 U.S. 857, 92 S.Ct. 107, 30 L.Ed.2d 99 (1971) (plaintiff who lacked certificate of public necessity from Utah Public Service Commission could not maintain antitrust action charging attempt to monopolize market for electrical power "if [Cottonwood] had no right to sell electricity, then by definition Power Company could not interfere with this right."); *Turner v. American Bar Association*, 407 F.Supp. 451 (N.D.Ind.1975), *aff'd sub nom. Taylor v. Montgomery*, 539 F.2d 715 (7th Cir. 1976) (unlicensed lawyers).

■ If "illegality" were a mere common law defense, a species of *in pari delicto*, *Perma Life* and *Kiefer-Stewart* would preclude the defense. But Section 4 of the Clayton Act itself provides a private treble damage remedy only where a party is "in-

jured in his business or property." "Injury" within this section implies violation of a legal right. *Keogh v. Chicago & Northwestern Ry. Co.*, 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922). And the courts in adjudicating antitrust claims have consistently inquired whether plaintiff's "business or property" is worthy of legal protection. See *Martin v. Phillips Petroleum Co.*, 365 F.2d 629 (5th Cir.), *cert. denied*, 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966).

The plaintiff here is not accused of violating a state or even a federal statute in the manner in which it conducted business; it admittedly is precluded by federal law from conducting any such business.

Title 49 U.S.C. § 1010(a)(1) provides, with certain exceptions not relevant here:

> No person shall engage in [freight forwarding] service[s] unless such person holds a permit . . .

Under 49 U.S.C. § 1010(c)

> The Commission shall issue a permit to any qualified applicant therefor, . . if the Commission finds that the applicant is ready, able, and willing properly to perform the service proposed, and that the proposed service, to the extent authorized by the permit, is or will be consistent with the public interest and the national transportation policy declared in this Act.

The Commission is empowered to enforce these provisions through suit for injunction, 49 U.S.C. § 1017(b). Willful violation is a misdemeanor punishable by fine.

■ The Court's task here is not to weigh the importance of the national transportation policy against the policies embodied in the federal antitrust laws. Nor is it to evaluate the comparative moral worth of those who violate one statute or the other. But the Court must read the statute under which plaintiff is suing, and if plaintiff's activities were precluded by federal law, then it has suffered no injury to its business or property which is compensable under the Clayton Act. This is not to suggest that any breach of any magnitude of any state or federal regulatory scheme will render an antitrust plaintiff an outlaw not entitled to

invoke the protection of the antitrust laws. But where plaintiff's entire business operation is conducted in blatant, willful violation of federal law, plaintiff will not be heard to complain that the profits of that illegal enterprise have been diminished because of defendant's wrongful refusal to deal. Those who practice law or medicine without a license cannot invoke statutes which prohibit anticompetitive business practices to protect their illegal practice; nor could an unlicensed gun dealer invoke these statutes against the manufacturer. The defense is not insufficient as a matter of law, and summary judgment for plaintiff must therefore be denied.

## CONCLUSION

Plaintiff's motion for summary judgment on Counts I and III of the complaint will be denied.[16]

---

16. The Court has considered the other contentions raised by the parties, and has concluded that they compel no different result.