511 F.Supp. 509 (1981)
CARPENTERS LOCAL UNION NO. 1846 of the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO, Carpenters District Council of New Orleans and Vicinity Pension Trust, Carpenters District Council of New Orleans and Vicinity Health and Welfare Plan, Carpenters District Council of New Orleans and Vicinity Apprenticeship Educational and Training Program, William John Fortney; Kenneth J. Perkins; Donald C. Haynes; Rayford H. Colamari; Lothard J. Broussard, Sr.; Franklin B. Hunter; Elaire Dauzat; Dennis J. Savoy; Lawrence J. Rousselle; Desire Bergeron; Vernon D. Harvey; and William J. Brignac, Jr. (Hereinafter Class I), James E. Crawford; Lawless J. Martin; Robert Brown; Charles Mitchell; Nathaniel E. Williams; Johnnie Williams; Fred Scott and Lee R. Miskell (Hereinafter Class II); and James E. Crawford; Lawless J. Martin; Robert Brown; Nathaniel E. Williams and Lee R. Miskell (Hereinafter Class III)
v.
PRATT-FARNSWORTH, INC.; Halmar, Inc.; New Orleans District, Associated General Contractors of Louisiana, Inc.; At Large District, Associated General Contractors of Louisiana, Inc.
Civ. A. No. 80-1570.
United States District Court, E. D. Louisiana.
April 2, 1981.
*510 Jerry L. Gardner, Jr., Barker, Boudreaux, Lamy, Gardner & Foley, New Orleans, La., for plaintiffs.
Frederick A. Kullman, Kullman, Lang, Inman & Bee, James Burton, Brian, Simon, Peragine, Smith & Redfearn, New Orleans, La., for defendants.

MEMORANDUM AND ORDER
JACK M. GORDON, District Judge.
Defendants, Pratt-Farnsworth, Inc.; Halmar, Inc.; Associated General Contractors of Louisiana, Inc., New Orleans District; and Associated General Contractors of Louisiana, Inc., At Large District, have moved the Court for dismissal of and, alternatively, for summary judgment in plaintiffs' suit styled as a class action. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, plaintiffs brought this action on behalf of all members of and all persons seeking employment through Carpenters Local Union No. 1846 and Pile Drivers Local Union No. 2436 of the United Brotherhood of Carpenters and Joiners of America, AFL-CIO. Additional represented plaintiffs include all affiliated participants and beneficiaries of the Carpenters District Council of New Orleans and Vicinity's Pension Fund, Health and Welfare Plan, and Apprenticeship Educational and Training Program. Also joined are the plaintiffs named of Class I, Class II, and Class III. Heretofore, the Court has not considered the merits of the class certification issue. Oral argument was heard on September 24, 1980, after which the Court took the matter under submission. Having reviewed the arguments, the memoranda of counsel, and the applicable law, the Court has decided to GRANT defendants' motion to dismiss.
The instant action evolved from the Carpenters District Council's bargaining relationship with the Associated General Contractors, Inc., New Orleans District (hereinafter *511 AGC, New Orleans), and the Associated General Contractors of Louisiana, Inc., At Large District (hereinafter AGC, At Large). Defendants Pratt-Farnsworth, Inc. (hereinafter Farnsworth) and Halmar, Inc., (hereinafter Halmar), employers engaged in the building and construction industry, affiliated themselves with the AGC organizations, thereby authorizing AGC to bargain in their behalf with the Carpenters District Council over wages, terms, and conditions of employment. Accordingly, AGC, New Orleans negotiated the collective bargaining agreement extending from May 1, 1977 to April 30, 1980 with the Carpenters District Councilsuch agreement constitutes the controverted subject matter of this suit.
The gravamen of plaintiffs' complaint is that defendants have conspired to restrain competition and to monopolize the construction industry in New Orleans and vicinity. Allegedly, Farnsworth established Halmar to create a union-free environment with the purpose of circumventing the "Craft Agreement," the collective bargaining agreement with plaintiff union. Plaintiffs further claim that the district organizations of the defendant AGC have participated in this monopoly through utilization of those "open-shop" contractors represented by the AGC, At Large.
In pursuance of their complaints, plaintiffs have filed this action, stating causes of action under three different sets of federal statutes; namely, (i) Section 301 of the Labor Management Relations Act, as amended 29 U.S.C. § 185(a); (ii) The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 (hereinafter ERISA); and (iii) the Clayton and Sherman Antitrust Acts, 15 U.S.C. §§ 1-7, 12-27 and 28 U.S.C. § 1332 et seq. Let us consider each of these in turn.

I.

The Section 301 Allegations
The Labor Management Relations Act, Section 301(a) establishes federal court jurisdiction for collective bargaining agreement violations.
Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties. 29 U.S.C. § 185(a)
Thus, suits maintainable under Section 301 must be based upon a collective bargaining agreement existing "between an employer and a labor organization...."

A. The Section 301 Allegations as applied to the AGC organizations

The Associated General Contractors of Louisiana, Inc. acts through its Collective Bargaining Committee as the bargaining agent for certain Association members. Solely those parties which signify their intention to accept the agreement's terms are contractually bound. The agreements, then, are neither negotiated for nor binding upon any other Association member, nor upon the Association itself. This is evidenced by the terms of the Collective Bargaining Agreement, Article I
PARTIES AND DEFINITIONS:

Section I. The parties to this Agreement are the following:
(a) Those members of the New Orleans District, Associated General Contractors of Louisiana, Inc. signatory hereto and listed in Appendix "A", together with such other members of said District who may hereafter become signatory hereto, hereinafter referred to as "Contractors" or "Employers" collectively, and as "Contractors" or "Employer" individually.
(b) Those Unions signatory hereto and listed in Appendix "B", hereinafter referred to as "Unions" collectively, and as "Union" individually. [emphasis added]
The AGC, New Orleans and the AGC, At Large are not signatories to the agreement. Rather, it is those members of the AGC, New Orleans that are contractually bound.
*512 The absence of such contractual relationship between AGC, New Orleans or AGC, At Large and Carpenters District Council mandates dismissal as to them of the Section 301 claim under settled authority in this jurisdiction. In Dixie Machine Welding & Metal Works, Inc. v. Marine Engineers Beneficial Association, 243 F.Supp. 489 (E.D.La.1965), the plaintiff brought suit in state court to enjoin defendant's picketing. The defendant-union sought removal to the federal court on the basis that it was a Section 301 action. The court said:
Defendant-union argues that this suit is based in part on the alleged breach of a collective bargaining agreement between the plaintiff-employer and various labor organizations and for that reason arises under Section 301. This contention is erroneous, however, because there is no collective bargaining agreement between the parties to this suit.... While it is alleged by plaintiff that the activity of its employees (resulting from their refusal to cross the picket line of Defendant) is being carried on in violation of the collective bargaining agreements between plaintiff and its employees, this suit is not against plaintiff's employees but against Marine Engineers Beneficial Association with which Plaintiff has no agreement of any kind. Between the parties to this action, therefore, there is no collective bargaining agreement and this is not a "suit for violation of contracts between an employer and a labor organization" or between labor organizations which Section 301 of the Labor Management Relations Act would confer jurisdiction in this court. 243 F.Supp. at 491. [emphasis in the original]
See also United Steel Workers of America, AFL-CIO v. Rome Industries, Inc. d/b/a Rome Plow Company, 437 F.2d 881 (5th Cir. 1970).

B. The Section 301 Allegations as applied to Farnsworth and Halmar

While Halmar is not a signatory to the contract, plaintiffs have argued that the affiliation between Farnsworth and Halmar should result in their characterization as a "single employer." This classification, plaintiffs contend, would impose the terms of the bargaining agreement upon Halmar.
The Court cannot agree with plaintiffs' contention because adoption of that position inevitably would result in this Court's usurpation of power to determine the appropriate "bargaining unit" reserved to the National Labor Relations Board. Section 9(b) of the National Labor Relations Act provides the following directive.
The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, or subdivision thereof .... 29 U.S.C. § 159(b)
South Prairie Construction Company v. Operating Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976) (commonly known as the Peter Kiewit case) presents a parallel situation. The union there filed a complaint with the N.L.R.B. alleging that South Prairie and Kiewit's refusal to apply the bargaining agreement effective between the Union and Kiewit to South Prairie's employees constituted a violation of the National Labor Relations Act § 8(a)(5) and (1), as amended 29 U.S.C. § 158(a)(5) and (1). The Court of Appeals for the District of Columbia Circuit had classified South Prairie and Kiewit as a "single employer," finding them guilty of an unfair labor practice since their combined employees comprised an appropriate bargaining unit. See Local No. 627, Int. U. of Operating Eng. v. N.L.R.B., 518 F.2d 1040 (D.C. Cir.1975).
While not disturbing the Circuit Court's decision regarding the "single employer" status, the Supreme Court held that this finding would not be dispositive in a determination of the appropriate bargaining unit under controlling N.L.R.B. cases.
The Board's cases hold that especially in the construction industry a determination that two affiliated firms constitute a single employer `does not necessarily establish that an employerwide unit is appropriate, *513 as the factors which are relevant in identifying the breadth of an employer's operation are not conclusively determinative of the scope of an appropriate unit.' 425 U.S. at 803, 96 S.Ct. at 1843. (citations omitted)
Thus, the Supreme Court concluded that the Court of Appeals had invaded the statutory province of the N.L.R.B. by deciding the § 9 "unit" question in the first instance. The Court restated that the "selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, `if not final, is rarely to be disturbed...,'" citing Packard Motor Co. v. N.L.R.B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). Furthermore, by foreclosing the Board from determining the § 9 appropriate bargaining unit, the Court of Appeals did not give "`due observance [to] the distribution of authority made by Congress as between its power to regulate commerce and the reviewing power which it has conferred upon the Courts under Article III of the Constitution.'" FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940).
The Court of Appeals for the Fifth Circuit has consistently recognized the Labor Board's authority in bargaining unit selection. In North American Soccer League v. N.L.R.B., 613 F.2d 1379 (5th Cir. 1980) the Fifth Circuit recognized that an employer's assumption of sufficient control over its franchisees' or members' employees could result in a joint bargaining requirement. It recognized, however, that the N.L.R.B. would impose this requirement in exercising its power to decide in each case whether the employee unit requested is an appropriate unit for bargaining.
In a bargaining order enforcement proceeding, the Fifth Circuit prefaced its merit determination by stating that "[T]he N.L. R.B. has statutory authority to determine bargaining units." 29 U.S.C. § 159(b). N.L.R.B. v. J. C. Penney Co., Inc., 559 F.2d 373 (5th Cir. 1977). The court reiterated its judicial review standards as: arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support. Packard Motor Car Co. v. N.L.R.B., supra; N.L.R.B. v. Alterman Transport Lines, Inc., 465 F.2d 950 (5th Cir. 1972). An employer must establish the designated unit as clearly inappropriate before setting aside a Board's certified unit. "A showing that some other unit would be appropriate is insufficient, for a choice among appropriate units is within the discretion of the Board." N.L. R.B. v. Fidelity Maintenance & Construction Co., 424 F.2d 707 (5th Cir. 1970). (emphasis supplied)
This Court thus concludes that adoption of plaintiffs' assertion that Farnsworth and Halmar are a single employer so as to make the instant labor contract binding upon Halmar necessarily would require a determination of the appropriate bargaining unit, and that such determination would be an invasion of the exclusive province of the N.L.R.B. not distinguishable from that condemned by the Supreme Court in the Peter Kiewit case. Hence, the motions to dismiss the Section 301 claims brought by Farnsworth and Halmar must be granted.

C. The Section 301 claims additionally fall for failure to exhaust the contractually mandated grievance procedure.

Article XXIII Disputes and Grievance Procedure of the collective bargaining agreement in question provides for dispute resolution pertaining to alleged violations to be culminated in "final and binding" arbitration. Heretofore, no party has filed any illegal practice charges.
An employee who had not resorted to the agreement's grievance method was precluded from instituting a state court suit for severance pay recovery in Republic Steel Corporation v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). The Supreme Court discussed the interests and policies supporting contractual grievance procedure utilization. As the general rule in cases to which federal law applies, the court stated the federal labor law requirement that employees asserting contract grievances must attempt use of the agreed-upon contract grievance procedure as the mode of redress. The court found that side-stepping *514 grievance means in favor of a lawsuit would deprive the parties "of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances." Allowance of a procedure's non-exclusivity would thus result in loss of its desirability as a settlement method. Such a situation "`would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.'" 379 U.S. at 653, 85 S.Ct. at 616, citing Local 174, Teamsters etc. v. Lucas-Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962).
The Supreme Court in Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) followed Republic Steel Corporation v. Maddox, supra, in enunciating that an employee is bound by the collective bargaining agreement's terms governing the enforcement of contractual rights. This rule has been followed in cases of the Court of Appeals for the Fifth Circuit and the Eastern District of Louisiana. Rabalais v. Dresser Industries, Inc., 566 F.2d 518 (5th Cir. 1978); Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167 (5th Cir. 1971). In Rivera v. NMU Pension and Welfare and Vacation Plan, New Orleans, Louisiana, 288 F.Supp. 874 (E.D.La.1968), the court dealt with a Section 301 suit brought by an employee seeking relief from her allegedly unlawful discharge. The court held:
The claim is based upon, and arises out of, the collective bargaining agreement. Consequently, when, as here, that contract contains provisions governing the manner in which contractual rights may be enforced, the employee is bound by those terms and cannot bypass the exclusive grievance procedures to air his claim in court. 288 F.Supp. at 877.
The prerequisite of exhausting contractual remedies prior to initiating a Section 301 suit applies equally to the plaintiff-union as to the plaintiff-individuals. Pittsburgh Die Sinkers Lodge No. 50 v. Pittsburgh Forgings Company, 255 F.Supp. 142 (W.D.Pa. 1966); California State Council of Carpenters v. Associated General Contractors of California, Inc., 404 F.Supp. 1067 (N.D.Cal. 1975); National Post Office Mail Handlers v. U.S. Postal Service, 594 F.2d 988 (4th Cir. 1979).

II.

The ERISA Allegations
Any contribution obligation to the various plaintiff trust funds resulting in ERISA liability must be founded upon some collectively bargained duty to make payments thereto. Paragraph 16 of the Complaint states:
By virtue of provisions contained in the collective bargaining agreements which defendants are bound by, defendants did promise and become obligated to make contributions, in amounts set forth below, to said Funds on behalf of its employees for each hour or portion thereof worked or for which wages were received by such employees, and class plaintiffs, from May 1, 1971, through the present, and continuing during the pendency of this litigation.
As indicated, supra, defendants, AGC, New Orleans and AGC, At Large are not signatories to any collective bargaining agreement with the plaintiff-union. Without being contractually bound, these defendants have no obligation to contribute to the Plaintiff Trust Funds. Thus, plaintiffs' ERISA cause of action fails against the AGC organizations.
While defendant Farnsworth must comply with the agreement's terms by virtue of its participatory capacity, defendant Halmar is under no similar obligation. Without having signed the contract, Halmar's liability for payments thereunder could only be based upon its relationship to Farnsworth. Correspondingly, as there is no allegation that Farnsworth has failed to make the proper payments regarding payroll employees, its only ERISA liability would stem from some payment obligation on behalf of Halmar's employees.
The Court's analysis of the Section 301 allegations is equally applicable in the ERISA context. Accordingly, the alleged ERISA liability could only arise if Farnsworth and Halmar are not only a "single employer" *515 but, in addition, constitute a single bargaining unit. As this status decision is relegated to the N.L.R.B., plaintiffs cannot have it decided by the Court in the first instance.
Claims under the ERISA statute have been likened to those under the Labor Management Relations Act in that both require an attempt to exhaust exclusive contractual internal remedies in settlement disputes before resort to federal court. Lucas v. Warner & Swasey Co., 475 F.Supp. 1071 (E.D.Pa.1979), citing Taylor v. Bakery & Confectionary Union and Industrial International Welfare Fund, 455 F.Supp. 816 (E.D.N.C.1978); Fox v. Merrill Lynch & Co., Inc., 453 F.Supp. 561 (S.D.N.Y.1978), distinguishing Lewis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 431 F.Supp. 271 (E.D. Pa.1977); Hammil v. Hoover Ball & Bearing Co., 85 L.R.R.M. 2231 (E.D.Pa.1973).
In Amato v. Bernard, 618 F.2d 559 (9th Cir. 1980), the court reviewed the ERISA text, and its legislative history, and concluded that Congress intended to grant the judiciary authority to apply the exhaustion doctrine in ERISA suits. The court further found that sound policy required such application. Since there has been no attempt at exhaustion in this case, the ERISA allegations should be dismissed as to all named defendants.

III.

The Antitrust Allegations
Defendants contend that the antitrust allegations must fall because of the non-statutory exemption of certain unionemployer agreements from the antitrust laws. These contentions must be considered in light of policies implicit in achieving a delicate balance between antitrust regulation and labor law. The benefits of an exemption based on the national policy favoring collective bargaining have been held to extend both to "labor" and to "non-labor" parties to such an agreement. Mackey v. National Football League, 543 F.2d 606, 612 (8th Cir. 1976) (citations omitted).
The court in Consolidated Express Inc. v. New York Shipping, Inc., 452 F.Supp. 1024 (D.N.J.1978) noted the inherent tension between national policies regulating competition and those regulating labor relations.
It is commonplace that the antitrust laws and the labor laws are antithetical. The antitrust laws are designed to promote competition; the unions are in the business of limiting it. It has fallen largely to the courts to work out a proper conciliation of these competing desiderata. 452 F.Supp. at 1036.
Thus, it has been said that such a basic tension mandates exemption from antitrust sanctions; it is appropriately granted where the policy favoring collective bargaining is so vital under the circumstances as to outweigh the interests served by free competition. Von Kalinowski, 7 Antitrust Laws and Trade Regulation § 48.01 (1980). Review of the accommodation process functioning yielded the following remarks:
With varying results, courts have struggled over issues such as the merits of exempting unions from antitrust regulation, the proper extent of this labor exemption, and the degree of scrutiny to be given collective bargaining agreements. In cases involving significant labor considerations and slight antitrust implications courts have found paramount the national policies favoring collective bargaining and have granted immunity or applied a labor exemption. Conversely, in cases involving significant market restraints and only tangentially affecting labor interests courts have applied the antitrust laws. Because no case has arisen with major labor and antitrust implications, the proper relationship between the fundamental national policies reflected in these laws never has been defined. (footnote omitted). Rober & Powers, Defining the Relationship Between Antitrust Law: Professional Sports and the Current Legal Background, 19 Wm. & Mary L.Rev. 395, 39596 (1978).
In the instant case, the plaintiff unions and class members are complaining of collective *516 bargaining obstruction and consequent injury to union functions and representation. This controversy can only be characterized as a labor dispute initiated by construction industry employees against their employers and the employer associations. Accordingly, the antitrust laws do not provide a vehicle for challenging the practices under attack in this suit.
This Court has considered the antitrust allegations in this case in light of, inter alia, Local Union No. 189, Amalgamated Meat Cutters, and Butcher Workmen of North America, AFL-CIO v. Jewel Tea Company, Inc., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) wherein an antitrust exemption was granted. In Jewel Tea, the unions had obtained a marketing-hours agreement from one group of employers. Upon duress of a strike vote placed upon Jewel, and notwithstanding its reluctance, Jewel entered into the contract that had previously been approved by the industry. Jewel then brought a lawsuit complaining of the union's action in forcing it to accept the agreement. This created a situation, the Supreme Court found, in which the agreement resulted not from the bargaining activities between the unions and an employer group but pursuant to the union's own labor interests. As the plaintiffs here are contesting Halmar's nonparticipation in collective bargaining and urging that the terms that are binding upon Farnsworth be imposed upon Halmar, their demands are similar to those made in Jewel Tea.
The Supreme Court in Jewel Tea was not called upon to adjudicate the merit of a substantive antitrust law violation. Rather, as presently before this Court, the issue to be decided was whether the collective bargaining agreement was exempt from attack because of the labor exemption from the antitrust law. After weighing the pertinent interests, the Supreme Court held that the expression of the national labor policy found in the National Labor Relations Act placed union-employer agreements beyond the Sherman Act's reach.
This Court follows Jewel Tea and finds that the controverted Craft Agreement is exempt from the Sherman Act. Employment terms and conditions are properly the subject of the law regulating collective bargaining the National Labor Relations Act. Consequently, the labor dispute resulting from Farnsworth's alleged circumvention of the agreement is outside antitrust parameters.
Mindful of judicial limitations, in light of the propensity and temptations that contribute to overly-litigious tendencies, this Court heeds the warning that "[j]udges should not, under cover of the Sherman Act umbrella, substitute their economic and social policies for free collective bargaining." United Mine Workers of America v. Pennington, Jewel Tea, 381 U.S. 676, 727, 85 S.Ct. 1607, 1623, 14 L.Ed.2d 640 (dissenting and concurring opinion). For it is without this Court's province to determine who should or who should not be a party to a collective bargaining agreement. Assuming, arguendo, the Court were called upon to make such a determination, the antitrust remedies would provide no guidance in adjudicating the parties necessary to effective employer-union bargaining negotiations.
Moreover, this matter, at its first instance, is delegated to the National Labor Relations Board. A contrary result would amount to precedent-setting usurpation of the Labor Board's primary jurisdiction.[1] Consistency with the Congressional policy enunciated in the National Labor Relations Act towards peaceful settlement of labor *517 disputes [29 U.S.C. § 151 (1970)][2] demands that a complaining party file a NLRB complaint alleging an unfair labor dispute rather than institute an antitrust suit. "[A]nti-trust doctrines throw scant light on the best means of resolving the conflicts of interest among employers, employees and labor unions." Moreover, judicial decisions in antitrust suits "contain intrinsic limitations making them unsuited" to the formulation of a consistent national labor policy. Cox, Labor and the Antitrust LawsA Preliminary Analysis, 104 U.Pa.L.Rev. 252, 261 (1955).
The Supreme Court offers additional authority in Connell Construction Company v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418, rehearing denied, 423 U.S. 884, 96 S.Ct. 156, 46 L.Ed.2d 114 (1975). This decision, although the case serving as the area's touchstone, has often been criticized.[3] Indeed, Connell "is important not only for its definition of the nonstatutory exemption, but also because of the confusion the Court created in applying the exemption." Von Kalinowski, § 48.03[2].
In Connell, supra, a union, Local 100, pressured the Connell Construction Company to sign an agreement promising to hire only subcontractors who had collective bargaining agreements with Local 100. The agreement was not a collective bargaining agreement, nor did the union seek to represent Connell's employees. The agreement effectively prohibited Connell from hiring subcontractors who offered lower prices even when the subcontractors' employees had wages and working conditions equivalent to Local 100 members. As a result, subcontractors who offered lower prices through more efficient operations were eliminated from competition. The court found that the nonstatutory labor exemption was not directed towards this elimination which constituted a direct restraint on the business market. The court recognized operation of the principles germane to the situation.
The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately *518 will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore had acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions.... Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, ... the nonstatutory exemption offers no similar protection when a union and a labor party agree to restrain competition in a business market. 421 U.S. at 622, 623, 95 S.Ct. at 1835.
The Connell decision emphasized the fact that the ConnellLocal 100 contract was not part of a collective bargaining agreement. The court reasoned, "There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective bargaining agreement." 421 U.S. at 625, 626, 95 S.Ct. at 1836-1837.
Considering the prominent distinguishing factors between Connell and the instant case, the Court is not compelled to follow Connell's disallowance of the non-statutory labor exemption. Thus, the Connell precedent offers a negative instructive by its determination of a situation not warranting the exemption. The Court has not been presented with any outside agreement containing the exclusionary measures found to restrain competition in Connell. A key element in Connell was that the union did not seek to represent and did not represent Connell's employees. It was also found that successful execution of the union strategy in Connell could have given the union the power to exclude subcontractors from the Dallas area. This potential has not been shown to exist in the instant case. Plaintiffs' allegation that defendants employ of construction workers "who, but for the illegal combinations and monopolies, all in restraint of trade and commerce, would have been covered by the collective bargaining agreements" (Plaintiffs' complaint, p. 6) does not transform this labor controversy into a justiciable antitrust cause of action.
Essentially, plaintiffs' dissatisfaction results not from an antitrust violation, but from the AGC's not having bargained collectively with the unions regarding Halmar's employment terms and conditions. The National Labor Relations Act, Section 8(a)(5) regulates such conduct by providing that "It shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) [29 U.S.C. § 159(a)]." 29 U.S.C. § 158(a)(5). The Fifth Circuit recognized these divisional lines in Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America, 431 F.2d 1004 (5th Cir. 1970). The union there claimed the attempted destruction of its operations through a conspiracy between Bluebell, Inc. and Prepmore. Bluebell allegedly agreed to aid in Prepmore's hindrance of the union's employee representation. Upon Prepmore's suit claiming damages arising out of the resulting union strike, the union countered with a Sherman Act claim and a state law damage claim for interference with union business. The Fifth Circuit affirmed the district court's Rule 12(b)(6) dismissal of both counts. As to count one, the court held:
The facts here go to a refusal to deal with the union with respect to conditions of employment, ordinarily a violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(5). There is no indication, however remote, of a conspiracy or a combination on the part of Prepmore and Bluebell to restrain competition in the marketing of Prepmore's goods. In sum, the allegations of the first count of the counterclaim do not rise to the level of alleging a restraint of the type to which the Sherman Act is directed. 431 F.2d at 1007.
The second count was dismissed on the preemption doctrine.

*519 The claim asserted in the second count, considered in the light of the facts alleged, falls short of the violence or threat to public order category saved for state regulation under the San Diego Building Trades Council case. This count is no more than a claim that Prepmore and Bluebell, together with their officers, conspired to unlawfully hinder and prevent the union from carrying on its lawful trade or calling. Taken in the context of the first count, this lawful calling consisted of a labor organization acting in a representative capacity in the area of negotiations concerning wages and other working conditions in the Prepmore plant and the consequent refusal to bargain. This claim is arguably within the confines of a refusal to bargain; conduct prohibited by § 8(a)(5) of the Labor Act, 29 U.S.C.A. § 158(a)(5). It was thus preempted. 431 F.2d at 1008.
In Amalgamated Clothing and Textile Workers v. J.P. Stevens & Co., 475 F.Supp. 482 (S.D.N.Y.1979), a union invoked the Sherman and Clayton Acts for relief in its ongoing struggle to organize the defendant Stevens, who contended that the parties should continue their battle "up and down the halls of the NLRB." The court found that the union had sufficient standing to assert the antitrust claim; the court nonetheless dismissed for failure to state a cause of action. Reiterating Professor Cox's oftquoted proposition that "No one seriously suggests that anti-trust policy should be concerned with the labor market per se," Cox, supra, at 254, the court held:
These authorities are dispositive, and require dismissal of the antitrust claims. The claims alleged "arguably" fall within the labor laws; indeed, a number of them virtually parrot statutory definitions of unfair labor practices. The antitrust laws do not furnish a remedy, since ACTWU's allegations, taken separately or in concert, do no more than complain of efforts to impede its activities as a union, entirely unaccompanied or uncomplicated by any element of monopolistic effect upon competition in the marketplace for goods and services. As such, the allegations do not rise to the level of an antitrust violation; and in consequence there is no basis to depart from the rule of Garmon and Lockridge, supra.[4] 475 F.Supp. at 490.
The controversy in Amalgamated Meat Cutters v. Wetterau Foods, 597 F.2d 133 (8th Cir. 1979) centered around an agreement whereby a wholesaler lent employees to a retail food supplier on a temporary basis to perform retail meat cutting during an economic strike. Upon the union's action under, inter alia, the Sherman Act, the Eighth Circuit upheld a district court's dismissal for failure to state a claim. "The District Court found that the complaint portrayed a labor dispute between union and employer and held that since federal labor laws clearly sanctioned the conduct involved, it could not give rise to an antitrust violation." 597 F.2d at 134 (footnotes omitted). The court stated that the antitrust laws were not enacted to regulate labor relations. Equally applicable to the instant case is the court's pronouncement:
Federal labor policy sanctions both the goal of resisting union demands and the method of replacing striking workers and the magnitude and nature of any restraint of trade or commerce in this case directly follows from the sanctioned conduct. The agreement had no anticompetitive effect unrelated to the collective bargaining negotiations. (footnote omitted) 597 F.2d at 136.
Furthermore, it is vital to recognize the implications of an unduly expansive use of the antitrust remedies. The Court takes cognizance of the foreseeable abuse that could result if the Sherman Act were invoked *520 in contexts other than that for which it was originally tailored. That is, the Act, "was enacted in the era of `trusts' and of `combinations' of businesses and of capital organized and directed to control of the market by suppression of competition in the marketing of goods and services, the monopolistic tendency of which had become a matter of public concern." Apex Hosiery Co. v. Leader, 310 U.S. 469, 492-493, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940). The Act was aimed at business combinations and not labor unions. Thus, this Court's refusal to adjudicate the instant Sherman and Clayton Act claims stems from a refusal to extend the Sherman Act beyond its bounds into an area governed by the comprehensive regulatory scheme provided by the National Labor Relations Act.[5]
The Sherman Act is not "a panacea for all business affronts which seem to fit nowhere else." Scranton Construction Company, Inc. v. Litton Industries Leasing Corp., 494 F.2d 778, 783 (5th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1974).[6] Owing to the Sherman Act's vital role in the free economy's preservation, its indiscriminate application would undermine the remedy's service. The Act's purposes "are best served by vigorous enforcement of it in the cases in which it was intended to apply, i. e., cases in which restriction or monopolization of trade or commerce are the object or the result of [the] defendant's conduct." Parmelee Transportation Company v. Keeshin, 186 F.Supp. 533, 547 (N.D.Ill.1960), aff'd, 292 F.2d 794 (7th Cir. 1961), cert. denied, 368 U.S. 944, 82 S.Ct. 376, 7 L.Ed.2d 340 (1961).
Rather than its misconception as a universal commercial remedywhich leads to its frequent invocationthe Sherman Act represents a charter of economic freedom operating within the `objective benchmarks' of market considerations. Kestenbaum v. Falstaff Brewing Corp., 575 F.2d 564, 571 (5th Cir. 1978).[7] The legislation has been described as the "`Magna Carta of free enterprise.'" Its importance to economic freedom, then, has been analogized to the personal freedom insurance of the Bill of Rights. Sitkin Smelting & Refining Co. v. FMC Corp., 575 F.2d 440, 448 (3d Cir. 1978), quoting United States v. Topco Associates, Inc., 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1971). In Sitkin Smelting & Refining Co., the court continued by recognizing the Bill of Rights' inapplicability to all personal affront and likening these limits to the Sherman Act's unsuitability for proscribing all unseemly business practices. Even though that court found the controverted manipulation of businessmen's *521 bids to be "clearly reprehensible," the court stated that the Sherman Act could not be "extended beyond its intended scope and used to police the morals of the marketplace." 575 F.2d at 448. Any adjudication involving the antitrust laws, then, must examine the economic reality of the relevant transaction. United States v. Concentrated Phosphate Export Association, 393 U.S. 199, 208, 89 S.Ct. 361, 367, 21 L.Ed.2d 344 (1968) (emphasis supplied).
The plaintiffs' efforts represent yet another judicial attempt at conforming a square peg to a round hole. The antitrust laws will not assuage nor cure the defendants' alleged circumvention of the "Craft Agreement." Accordingly, they do not provide the proper redress to alleviate the effects of Farnsworth's alleged creation and operation of Halmar.
California State Council of Carpenters v. Associated General Contractors of California, Inc., supra, presents a similar situation to the case at bar. Plaintiff unions filed a five-count complaint alleging a general conspiracy to weaken and destroy them by hiring nonunion employees. The court based plaintiffs' allegations of antitrust law violations on the defendants' declination to enter into agreements with plaintiffs that would oblige them to deal only with subcontractors which were signatories to contracts with the plaintiffs. Such contracts were viewed as the precise type of agreement creating the Connell union's antitrust liability. That is, the Connell court sustained an antitrust claim based on the union's exerted pressure against an employer to enter into the type agreement in which the defendant employers in California State Council refused to participate. Review of the Connell holding and the considerable body of case law declining to recognize an antitrust cause of action alleged by a union against an employer in the normal type of labor dispute mandated the court's dismissal of the antitrust claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Crucial to these determinations stands the distinction that "[W]hile an agreement between a union and an employer to conspire in some respect may give rise to an antitrust violation, the normal labor dispute between union and employer does not. 404 F.Supp. at 1069. (citations omitted).
While this motion was under submission, the Ninth Circuit reversed the district court's dismissal in California State Council, supra, for failure to state a claim upon which relief could be granted. In retaining the Sherman Act claims, the court in Carpenters v. General Contractors, 648 F.2d 527, 105 LRRM 3311 (9th Cir. 1980) negated the previously-found nonstatutory labor exemption from antitrust liability. At the core of the majority's substantiation lay a recharacterization of the plaintiffs' complaint. The appellate court found that the unions had alleged an agreement "to coerce owners of property, general contractors, and `other letters of construction contracts,' with whom the Unions had no collective bargaining relationship, to hire only construction firms, primarily subcontractors, who had not signed with the Unions." at 532, 105 LRRM at 3314-15. In this posture, the case presented "virtually the obverse" of the Connell situation; with the same threat posed by both the California State Council employers' group and the Connell union, it was suggested that application of the Connell rationale would lie "with at least equal force." at 532, 105 LRRM at 3315. By contrast, the district court's characterization resulted in a finding that the defendants avoided the activity prohibited on Connell by their non-conduct.[8]
This Court is not bound by the Ninth Circuit precedent, and finds the majority's disposition of the case unpersuasive. Thus, the Court must decline to follow its pendulated interpretation of what, this Court believes, was a correct district court result. The dissenting opinion by Circuit Court Judge Sneed is enlightening.
*522 The dissent was premised on the rationale that the majority had mischaracterized the complaint, disagreeing with its depiction as the "flip side" of Connell. It agreed with the district court's characterization, reiterating that, assuming the requisite proof of the antitrust allegations, the complaint's claim would permit unions to achieve precisely what Connell prohibited.
That is, employers with whom plaintiffs have no collective bargaining relationship will be eliminated from the relevant market with the resulting impairment of competition. This will come about not because of an agreement by employers with the plaintiffs of the type condemned by Connell, but because the now real threat of antitrust liability will divert virtually all subcontracting to employers having a collective bargaining relationship with the plaintiffs. Those with a taste for irony will no doubt savor the spectacle of Connell self-destructing. at 542, 105 LRRM at 3322.
The dissent found that the plaintiffs' basic allegation of injury was impairment to their representation of construction industry workers. Without the restraint upon commercial competition in the marketing of goods and services, see Apex Hosiery Co. v. Leader, supra, such an injury was not within the ambit of antitrust law. The dissent therefore directed redress pursuant to the terms of the National Labor Relations Act. 29 U.S.C. § 151 (1976). See Motor Coach Employees v. Lockridge, supra; San Diego Building Trades Council v. Garmon, supra.
The Carpenters case, then, presents a strikingly similar situation to the case at bar. The plaintiffs have complained of their representational efforts' impairment by Farnsworth and Halmar which this Court cannot translate into a justiciable antitrust claim. Their action is solely cognizable under the comprehensive labor regulatory scheme of the N.L.R.A. The antitrust law provides no alternative, substitute, nor supplemental remedy in a bargaining dispute.
The Carpenters' dissent also rejects the majority's justification for the action's justiciability under the Sherman Act. That is, the majority found that the complaint alleged a conspiracy directed at employers which otherwise would have entered into collective bargaining agreements with plaintiffs. The dissent attacked this reasoning in light of the economic realities of employer-employee relations. This Court is in accord with the dissent in its criticism of the majority's unfounded assumption of a causal relationship between employers without collective bargaining agreements and an economically significant injury. The dissent pointed to the possibility that such employers could even be more profitable than those bound by an agreement.
In the Carpenters case, the employers without agreements were absent from the lawsuit. Their absence reinforced the dissent's conclusion that the plaintiffs' complaint stemmed solely from injury to the representational efforts. Even though Halmar is a party to this action, the dissent's reasoning applies to the extent that this Court cannot engage in the speculation that would be necessary to justify the leap that the fact of Halmar's nonparticipation in the Craft Agreement has resulted in economic injury to plaintiffs. The plaintiffs are complaining because of Halmar's position as a construction industry employer which is not contractually bound to the obligations existing between Farnsworth and plaintiffs.
I reach the conclusion so well-stated by the Carpenters' dissent. "When all is said and done, this is a labor case wearing an antitrust costume and inspired no doubt by the employer victory in Connell Construction Co. v. Plumbers & Steamfitters Local 100, supra. It should remain a labor case." at 543, 105 LRRM at 3323.

CONCLUSION
Based on the foregoing authorities and analysis, the Court hereby GRANTS the motion to dismiss brought by Pratt-Farnsworth, Inc.; Halmar, Inc.; Associated General Contractors of Louisiana, Inc., New Orleans District, and Associated General Contractors of Louisiana, At Large District.
NOTES
[1] In Connell Construction Company v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418, rehearing denied, 423 U.S. 884, 96 S.Ct. 156, 46 L.Ed.2d 114 (1975), and in Meat Cutters Local 189 v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), the Supreme Court circumvented the doctrine of primary jurisdiction by finding that "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." Owing to its characterization of this matter as a labor dispute, this court will not follow such a circuitous route of assuming jurisdiction.
[2] That section, entitled "Findings and Policies" provides, in pertinent part:

The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.
* * * * * *
It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.
[3] The Connell decision prompted abundant commentary. Included in such discourse are the following statements.

"The most controversial case of the 1974 Term was Connell Construction Co. v. Plumbers Local 100, a 5-4 decision in which the court found a novel and puzzling way for depriving labor unions of their general exemption from the antitrust laws." Bartosic, The Supreme Court 1974 Term: The Allocation of Power in Deciding Labor Law Policy, 62 Va.L.R. 533 (1976).
"By distinguishing between the statutory and nonstatutory exemptions for labor union activity, the majority does remove some of the confusion surrounding the determination of labor's antitrust exemption; yet the court supplied no specific criteria for the nonstatutory balancing test beyond a vague weighing of competing goals." Paulsen, Labor's Exemption from Federal Antitrust Law: The Diminishing Protection for Union Activity, 28 U. of Fla.L.R. 620 (1975).
[4] San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) and Motor Coach Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971) did not involve antitrust claims. These cases' importance stems from their recognition of the NLRB's exclusive competence over any activity "arguably subject" to § 7 or § 8 of the National Labor Relations Act and, as such, the resulting preemption of state and federal court jurisdiction.
[5] Cf. Tugboat, Inc. v. Mobile Towing Co., 534 F.2d 1172 (5th Cir. 1976) wherein the Fifth Circuit considered the standing requirements relative to an antitrust action. The court held that injury to employment opportunities or to a union's business activities would provide sufficient grounds for institution of a Sherman Act and Clayton Act suit upon the requisite showing. The complainant must prove that he was in the "target area" of the conspiracy and that the injuries to the "commercial interests or enterprises" were proximately caused by the anticompetitive combination. The Tugboat case, however, offers no dispositive guidance to the instant adjudication. That court specifically declined to reach the question of whether the labor regulatory scheme would remove the case from antitrust protection. 534 F.2d at 1174.
[6] See also, Spectrofuge Corporation v. Beckman Instruments, Inc., 575 F.2d 256, 290 (5th Cir. 1978); Natrona Service, Inc. v. Continental Oil, 435 F.Supp. 99, 111 (D.Wyoming, 1977); In Re Multidistrict Vehicle Air Pollution, 367 F.Supp. 1298, 1304 (C.D.Cal.1973), aff'd 538 F.2d 231 (9th Cir. 1976); Industrial Building Materials, Inc. v. Interchemical Corp., 278 F.Supp. 938, 959 (C.D.Cal.1967).
[7] The quoted phrase derives from Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568, n. 21 (1977). Continuing the quoted footnote:

... Competitive economies have social and political as well as economic advantages, see e. g., Northern Pac. R. Co. v. United States, 356 U.S. [1] at 4, 78 S.Ct. [514], at 517 [2 L.Ed.2d 545], but an antitrust policy divorced from market considerations would lack any objective benchmark. As Mr. Justice Brandeis reminded us: "Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." Chicago Board of Trade v. United States, 246 U.S. [231], at 238, 38 S.Ct. [242], at 244 [62 L.Ed. 683]... (emphasis supplied)
[8] The relevant portion of the plaintiffs' amended complaint charges that defendants "advocated, encouraged, induced, coerced, aided and encouraged owners of land and other letters of construction contracts to hire contractors and subcontractors who are not signatories to collective bargaining agreements with plaintiffs and each of them; ..."